**Paul PATZ, et al., Plaintiffs–Appellees,**

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY, Defendant–Appellant.**

No. 93–2135.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1993.

Decided Feb. 2, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied March 17, 1994.

Dean P. Laing (argued), O'Neil, Cannon & Hollman, Milwaukee, WI, for plaintiffs-appellees.

Thomas R. Schrimpf (argued), Susan R. Tyndall, Hinshaw & Culbertson, Milwaukee, WI, for defendant-appellant.

Laura A. Foggan, Daniel E. Troy, Russell Sullivan, Wiley, Rein & Fielding, Washington, DC, for amicus curiae.

Before POSNER, Chief Judge, KANNE, Circuit Judge, and REINHARD, District Judge.*

POSNER, Chief Judge.

St. Paul Fire & Marine Insurance Company appeals from a judgment in favor of its insureds (the Patz family and their corporation), rendered after a jury trial. The appeal requires us to interpret a pollution-exclusion clause found in many liability insurance policies. Federal jurisdiction is based on diversity of citizenship, and the substantive issues are governed by the law of Wisconsin.

In the northern Wisconsin town of Pound, the family Patz has a substantial although not sophisticated business of manufacturing farm equipment. Founded by a Patz whose formal education had ended in the third grade, the business is now managed by his three sons and one son-in-law, none of whom—as their counsel has emphasized to us—has a college education. No employees of the business are college-educated, either. In 1971, the Patzes decided that before selling the farm equipment they manufacture they would paint it. Two consulting firms, paid "alot of bucks" by the Patzes for their expertise in the paint business, not only set up a production line for painting the equipment but also advised the Patzes on how to dispose of the wastes generated as a by-product of the painting. One of these wastes is water contaminated by phosphate. The consultants suggested that the Patzes dig an open pit for the water. The idea, well accepted in the waste-disposal community at the time, was that the water would evaporate, leaving a deposit of phosphate solids that would rest at the bottom of the pit and could be easily removed and used as fertiliz-

* Hon. Philip G. Reinhard of the Northern District of Illinois.

er. Because the soil where the pit was to be dug was highly compacted clay soil, the water was expected to evaporate before it could permeate the soil, and so the soil beneath the pit would not be contaminated. Another waste by-product of the painting process, paint sludge, the consultants advised the Patzes to shovel into barrels which could be carted off to the town dump to be burned or buried there.

All this was done as recommended by the consultants until 1980, when Wisconsin's Department of Natural Resources began nosing around the Patzes' operation. The Department advised the Patzes that although the barrels of sludge were not hazardous to the environment, the town dump was not licensed to receive them. The Department told them to remove the barrels, 27 in number, that the dump had not as yet either buried or burned. Rather than taking the barrels to a licensed dump, as the Department suggested but did not order, the Patzes took the barrels back to their property, buried them, and paved them over to make an extension of the factory's parking lot. As additional sludge accumulated, the Patzes burned them on their premises. Although the Department's focus was on the barrels, not the evaporation pit, the Patzes discontinued the use of the pit in 1980 and filled it in the following year.

The Patzes' homes are located on the same premises as their factory, and to the south of the pit and the parking lot. Water in the area runs from north to south.

In 1986 the Department returned and conducted an environmental audit which discovered groundwater contamination from the pit and soil contamination from the buried barrels, though in neither case had the contamination spread beyond the Patzes' premises. The Department ordered the removal of the barrels together with some of the soil beneath it, and the removal of a good deal of soil beneath the pit. It cost the Patzes $400,000 to clean up the two sites, and that is the amount they sought to recover from the insurance company.

St. Paul resisted on the basis of two clauses in the liability insurance policy. The first, the pollution-exclusion clause, excludes coverage for "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants into or upon land, the atmosphere, or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." St. Paul's position is that the deposit of the phosphate-contaminated water in the evaporation pit, and of the barrels of paint sludge in the ground beneath the parking lot, constituted a "discharge" of waste materials into the land. This discharge, though not the resulting contamination, was intentional, not accidental, and therefore does not come within the exclusion from the exclusion. The Patzes counter that all that is excluded from the exclusion is discharges by which the insured intends to cause damage, in this case damage in the form of pollution or contamination of soil and groundwater. They add that St. Paul should be "judicially estopped" to contest this interpretation because at trial the insurance company tried to prove that the insureds had known that their methods of disposing of the waste by-products of their painting activities were contaminating the land. In rejecting this theory of the defense, the jury may have been impressed by the Patzes' lack of higher education and the implausibility of their deliberately contaminating their own land. We do not know the source of their drinking water, but we do know that they have two ponds on their land from which they like to fish.

The Patzes' invocation of the doctrine of judicial estoppel, on which see our recent discussion in *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427–28 (7th Cir.1993), is futile. The doctrine presupposes a judgment (or its administrative equivalent), for all it does is forbid a person who has won a judgment on one ground to repudiate that ground in a subsequent litigation in an effort to obtain a second judgment. It is thus about abandoning winning, not losing, grounds. St. Paul won nothing by attempting to prove that the Patzes knew that their method of disposing of paint wastes would

damage the land. The attempt was an alternative to the grounds that St. Paul continues to press in this court, and the abandonment of the attempt on appeal was a laudable effort to narrow the issues and should not redound to the company's harm. Of course, had the insurance company failed to present in the district court the grounds it is pressing on appeal, the abandonment of a ground that it had pressed would spell finis to the appeal; it would have abandoned its only nonwaived ground. That is not what happened.

■ By their mention of judicial estoppel the Patzes may have been groping for a related but separate doctrine, that of "mend the hold," which limits the right of a defendant in a breach of contract suit to change the ground of his defense midway through the lawsuit. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362–65 (7th Cir. 1990). That doctrine, unlike judicial estoppel, does not require a judgment. But a vague allusion is not enough to preserve an issue for review, *DDI Seamless Cylinder Int'l Inc. v. General Fire Extinguisher Corp.*, 14 F.3d 1163, 1168 (7th Cir.1994), and although an appellate court can affirm a judgment on a ground not reached by the district court, this assumes that the ground was waived neither in the district court nor in this court. *Crane v. Indiana High School Athletic Ass'n*, 975 F.2d 1315, 1319 (7th Cir. 1992); *Frederick v. Marquette Nat'l Bank*, 911 F.2d 1, 2 (7th Cir.1990); *Martinez v. United Automobile, Aerospace & Agricultural Implement Workers*, 772 F.2d 348, 353 (7th Cir.1985). If it was waived, the appellant will have had no occasion to contest it, and would be unfairly surprised by a decision based upon it. Cf. *Hartmann v. Prudential Ins. Co.*, 9 F.3d 1207, 1214 (7th Cir.1993).

■ At first and even second glance, the insurance company's interpretation of the pollution-exclusion clause has a great deal to recommend it. Excluded from coverage, on the most natural reading of the clause, are all discharges (etc.) of waste materials, except those that are sudden and accidental. Although it is exceedingly unlikely that the Patzes intended to foul their own nest by disposing of the paint wastes in the way they did, there was nothing sudden and accidental about the deposit of the phosphate-contaminated water in the evaporation pit or about the burying of the barrels of paint sludge to extend the parking lot. What is more, as enterprises in this day and age generally do not pollute intentionally, the pollution-exclusion clause would have a very limited domain if interpreted as excluding only deliberate pollution. And another clause in the insurance policy excludes intentional harms, making the pollution-exclusion clause redundant if interpreted as narrowly as the Patzes would like.

■ Yet there are cases that read the pollution-exclusion clause just that narrowly. *United Pacific Ins. Co. v. Van's Westlake Union, Inc.*, 34 Wash.App. 708, 664 P.2d 1262, 1266 (1983); *Niagara County v. Utica Mutual Ins. Co.*, 80 A.D.2d 415, 439 N.Y.S.2d 538, 540 (1981). We are drawn to an intermediate interpretation, in which the clause is read to distinguish between deliberately discharging waste materials into land, air, or water, whether or not "harm" is intended, and placing those materials in a container that is buried in land or water and subsequently leaks or breaks, discharging waste materials into the land or water surrounding the container. The distinction is easy to see with regard to the barrels of paint sludge. The Patzes might just have dumped the sludge on the ground; if so, whether or not they intended to pollute the land or even knew it might pollute the land, any liability resulting from this dumping would, on the interpretation we are exploring, have been excluded. That is not what they did. They put the sludge in barrels and buried them. As the barrels themselves were not contaminants, no discharge of contaminants into the soil occurred until the barrels leaked or broke. The discharge that occurred then— the discharge from the barrels—was "sudden and accidental" in the sense of unintended and unexpected, which is the meaning that Wisconsin's highest court impressed upon those words in *Just v. Land Reclamation, Ltd.*, 155 Wis.2d 737, 157 Wis.2d 507, 456 N.W.2d 570 (1990).

The case of the evaporation pit is more difficult for the Patzes. The floor of the pit was the soil, so when the phosphatic water was first poured into the pit it was introduced directly into the land with no barrier corresponding to the material of the barrels protecting the land from the contaminant. But soil is of course a building material. Bricks are made out of straw and mud, there are mud huts and dugouts, and tents and other simple dwellings often have dirt floors. The Patzes' evaporation pit was a containing structure, despite its lack of artificial materials. The Patzes believed (a belief induced by their consultants) that they were taking advantage of the clay composition of the soil to avoid the expense of an artificial bottom for the pit. The clay would stop the water and when the water evaporated, the phosphatic solids would form a crust at the bottom of the pit that would be removed (to be used for fertilizer) before any harm was done to the soil beneath it. The introduction of the phosphatic water into such a structure is different from just dumping wastes onto land or into a body of water. The discharge of wastes into the environment did not occur until the water leached through the bottom of the pit; and the leaching was unintended and unexpected.

This reading of the pollution-exclusion clause, which distinguishes between an intentional act not intended to discharge wastes into the environment and an intentional such discharge, is not inevitable, but it is plausible, and it is consistent with a number (possibly the majority, though this is unclear, *New Castle County v. Hartford Accident & Indemnity Co.*, 933 F.2d 1162, 1195 (3d Cir. 1991)) of the cases—signally including the *Just* case, decided by Wisconsin's highest court and therefore binding on us in this diversity suit. For similar cases from other jurisdictions, see, e.g., *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1219–20 (Ill.1992); *Jackson Township Municipal Utilities Authority v. Hartford Accident & Indemnity Co.*, 186 N.J.Super. 156, 451 A.2d 990, 994 (1982); *Allstate Ins. Co. v. Klock Oil Co.*, 73 A.D.2d 486, 426 N.Y.S.2d 603 (1980). The contrary view, which would deny coverage in a case such as this, is illustrated by *Broderick Investment Co. v. Hartford Accident & Indemnity Co.*, 954 F.2d 601, 607 (10th Cir.1992) (applying Colorado law), and *Mays v. Transamerica Ins. Co.*, 103 Or.App. 578, 799 P.2d 653, 656–57 (1990).

St. Paul points out that the court in *Just* as in most of the cases in that line framed the question for decision as whether "sudden and accidental" could be read broadly, to mean unintended and unexpected, consistently with the drafting history of the pollution-exclusion clause. *New Castle County v. Hartford Accident & Indemnity Co.*, supra, 933 F.2d at 1196–98. But the answer the court gave to that question is vital to the distinction that we have been emphasizing between placing waste materials in land or water in a container that later leaks, and the leakage itself. The initial placement, although intentional, is not the discharge. The leakage, although not sudden and accidental in the usual sense of these words, *is* the discharge, and is not excluded from coverage; it is sudden and accidental in the special sense of unintended and unexpected.

*Just* may actually go further than we need go in order to affirm the judgment for the insureds in this case. The frequent references in the opinion to unexpected or unintended injury or damages (155 Wis.2d 737, 157 Wis.2d 507, 456 N.W.2d at 571–72, 573, 575, 578) suggests that the Supreme Court of Wisconsin thinks the pollution-exclusion clause falls out even if there is a deliberate discharge of wastes into the environment, provided only that the discharger did not know or have reason to believe that the discharge would cause harm. The objections to this extreme position are marshaled with great force in Judge Becker's opinion in *New Castle County*, supra, 933 F.2d at 1199–1203. As he points out, an enterprise that knows it is discharging potentially harmful wastes into the environment but does not think they are harmful will have no incentive to reduce that discharge if the enterprise is insured for the consequences. That is different from the situation of an enterprise which believes that it has confined its wastes to a secure container. *Just* itself involved a landfill, and most landfills do not seek to contain the wastes dumped in them. We cannot, of course,

overrule *Just,* but we are not obliged to place the broadest possible interpretation on the decision. Ours is the easier case in which the intent is to contain rather than discharge the wastes, so that the discharge itself is an accident though only in a loose sense "sudden."

■ St. Paul's alternative ground is that the policy excludes coverage for property damage to property owned by the insured, and to date the only contamination from the waste materials generated by the painting operation is to soil and groundwater within the boundaries of the Patzes' own land. But the Patzes are not attempting to obtain an insurance award for a reduction in the value of, or other damage to, their land. How could they? It is a policy of liability insurance, not casualty insurance, on which they have sued. They seek to recover the cost of complying with a government order to clean up a nuisance. The fact that the clean up occurred on their land is irrelevant. For all we know, the damage to the land was much less than the cost of cleaning it up.

We do not understand St. Paul to be arguing that the only liability against which the policy insures is liability to pay damages obtained by a lawsuit (or threat of suit) against the insured. St. Paul does argue that its policy stops short of reimbursing an insured for voluntarily undertaking to reduce potential liability, and we agree. The owner of an automobile cannot charge the expense of a fancy new braking system to his liability insurer on the ground that the system will make it less likely that he will injure someone in an accident. But the Patzes incurred the clean-up costs for which they seek reimbursement under the policy involuntarily.

On the view we take of the owner-exclusion clause, it is irrelevant whether the groundwater beneath the Patzes' property is owned by them or (as the cases appear to hold, *City of Edgerton v. General Casualty Co.,* 172 Wis.2d 518, 493 N.W.2d 768, 784 (Wis.App. 1992), review granted, 497 N.W.2d 130 (Wis. 1993); *Maryland Casualty Co. v. Wausau Chemical Corp.,* 809 F.Supp. 680, 693 (W.D.Wis.1992) (applying Wisconsin law); *Intel Corp. v. Hartford Accident & Indemnity Co.,* 952 F.2d 1551, 1565 (9th Cir.1991) (applying California law)) by the state, how soon the groundwater contamination would have spread to groundwater beneath neighbors' property if the clean-up had not been ordered, whether but for the clean up the contamination from the barrels of paint sludge would have leached to soil beneath the neighbors' property, or in short how much of a risk to other people's property the contamination created. The Patzes are not seeking to recover for damage to their property; they are seeking to recover the cost of the liability that the Department of Natural Resources imposed on them for maintaining a nuisance. *City of Edgerton v. General Casualty Co., supra,* 493 N.W.2d at 784; *Maryland Casualty Co. v. Wausau Chemical Corp., supra,* 809 F.Supp. at 693; *Intel Corp. v. Hartford Accident & Indemnity Co., supra,* 952 F.2d at 1565; *Gerrish Corp. v. Universal Underwriters Ins. Co.,* 947 F.2d 1023, 1030–31 (2d Cir.1991).

■ The insurance company has filed a motion asking us to certify the questions of coverage to the Supreme Court of Wisconsin, pursuant to 7th Cir.R. 52. We deny the motion. There is no room for serious doubt about how that court would answer the questions. The two exclusions at issue are designed to exclude coverage for deliberately discharging pollutants directly into soil, air, or water, which did not occur—the only discharges were the unintended and unexpected consequences of the defective containers in which the pollutants had been placed—and for damage to the insured's own property, which is not the basis of the insureds' claim, as opposed to liability to third parties, in this case the government. The district court's decision in favor of the insured must therefore be

AFFIRMED.