FIGGIE INTERNATIONAL, INC.,
Plaintiff–Appellant,

v.

Fred W. BAILEY, James Upfield, Travelers Ins. Co., and Insurance Co. of North America, Defendants–Appellees.

No. 93–4845.

United States Court of Appeals,
Fifth Circuit.

June 29, 1994.

Sidney L. Shushan, Guste, Barnett & Shushan, New Orleans, LA, for appellant.

James Robertson, Dennis M. Flannery, John R. Read, Warren O. Asher, Juanita A. Crowley, Wilmer, Cutler & Pickering, Washington, DC, Richard C. Stanley, Laurie B. Halpern, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, LA, for Ins. Co. of North America.

G. Dennis Sullivan, Allison A. Jones, William O. Holston, Jr., Sullivan, Ave & Holston, Dallas, TX, for Bailey & Upfield.

Ralph S. Hubbard, III, Gordon P. Wilson, Lugenbuhl, Burke, Wheaton, Peck & Rankin, L.C., New Orleans, LA, for Travelers Ins. Co.

Before POLITZ, Chief Judge, DAVIS and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff–Appellant Figgie International, Inc. ("Figgie") appeals the summary judgment dismissal of Defendants–Appellees Travelers Insurance Company ("Travelers") and Insurance Company of North America ("INA")—collectively, "the insurers"—from an action brought to recover the costs of a remedial action undertaken on property that Figgie formerly owned. Figgie also appeals the summary judgment dismissal of the claims it asserted against Defendants–Appellees Fred W. Bailey and James Upfield purportedly grounded in the Louisiana Environmental Quality Act ("LEQA").[1] Concluding for the reasons hereinafter explained that the district court's dismissals were proper, we affirm.

I

FACTS AND PROCEEDINGS

In October 1965, Baifield Industries, Inc. ("Baifield") acquired property in Caddo Parish, Louisiana (hereafter, "the Figgie property") upon which it built two manufacturing facilities—a bomb-fin plant and a shell-casing plant. In June 1967, Baifield sold the property to Figgie which continued to operate the plants until 1969. In September 1969, Figgie sold the property to Norris Industries ("Norris"), agreeing as part of the sales contract to indemnify Norris for "all damages arising out of the prior conduct of [Figgie's] business."[2] During the period that it owned the property, Figgie was covered by a number of comprehensive general liability ("CGL") policies issued by the insurers.

As a byproduct of Baifield and Figgie's manufacturing activities, liquid wastes containing hazardous substances were generated. Following chemical treatment, these liquid wastes were discharged into two sedimentation ponds located on the Figgie property. In the mid–1980s, the Louisiana Department of Environmental Quality ("LDEQ") determined that hazardous substances had been discharged or disposed of on the Figgie property. In 1986, pursuant to its authority under the LEQA, the LDEQ made written demand on Norris to undertake remedial action on the Figgie property. Norris promptly notified Figgie of the LDEQ's remediation demand, but initially undertook the remedial action on its own.

The remedial action proceeded in two stages. During the first stage, soil and sediment was removed from a concrete trench that had been used to convey the liquid waste from the manufacturing facilities to the chemical-treatment area. In addition, soil was excavated from the area around an inactive incinerator where chemicals had been stored.[3] In the second stage, the chemical-treatment area, an additional portion of the concrete trench, and the two sedimentation ponds were subjected to remediation. That remedial action consisted of draining the ponds and excavating the mixture of soil and

---

1. Codified at La.Rev.Stat.Ann. 30:2001–2503 (West 1989 & Supp.1993).

2. Norris did not conduct any manufacturing activities on the property.

3. It appears that the contamination associated with the trench and the incinerator was localized. At least, Figgie does not contend that the contaminants in these areas have caused harm or were a threat to groundwater or off-site property.

sludge that had accumulated on the bottom. This soil/sludge mixture was determined to be contaminated with cadmium, a hazardous substance, and then was transported to a disposal facility. Neither Norris nor the LDEQ conducted any groundwater testing in connection with the remedial action.

Following completion of the first stage, and in response to a request by Norris, the LDEQ made written demand on Figgie to undertake remedial action on the Figgie property. Figgie promptly notified the insurers of the LDEQ's remediation demand. Figgie then collaborated with Norris in the second stage of the remedial action, agreeing to share the costs. In October 1989, following completion of the remedial action, Norris brought suit against Figgie, seeking reimbursement for its full remediation costs. Figgie notified the insurers of Norris' lawsuit and requested that the insurers assume its defense. Both insurers declined, asserting that Norris' claims were not covered by their respective policies. Eventually, Figgie and Norris settled, with Figgie agreeing to reimburse Norris for its full remediation costs and promising to pay for future remediation of the Figgie property.

In August 1990, Figgie made written demand on Bailey and Upfield—who were shareholders, officers, and directors of Baifield at the time that it owned the property— for reimbursement of the money that Figgie had paid to Norris. Three days later, Figgie filed the instant suit against Bailey, Upfield, and the insurers. Figgie alleged causes of action against Bailey and Upfield pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")[4] and the LEQA. In addition, Figgie alleged that the insurers were obligated under their CGL policies to indemnify Figgie for the remediation costs it incurred.

Bailey and Upfield moved for partial summary judgment, seeking dismissal of the LEQA claims on the ground that the LEQA did not authorize a private action against them. The insurers also moved for summary judgment, seeking dismissal of Figgie's claims against them on the ground that their policies excluded coverage of Figgie's remediation costs. The district court referred the summary judgment motions to a magistrate judge who set September 1991 as the deadline for summary judgment briefing. Following expiration of the deadline, the magistrate judge exercised his discretion and admitted numerous additional affidavits and memoranda. After reviewing all the summary judgment submissions, the magistrate judge recommended that summary judgments be granted, dismissing the LEQA claims against Bailey and Upfield, and dismissing all claims against the insurers.

Figgie timely objected to the magistrate judge's report and recommendations. In addition, Figgie sought leave of the district judge to file an additional affidavit in opposition to summary judgment, but the district judge declined to admit the additional affidavit. Adopting the magistrate judge's report and recommendations, the district judge granted summary judgment in favor of the insurers and dismissed the LEQA claims against Bailey and Upfield. As other claims against Bailey and Upfield remained pending, final judgment was entered pursuant to Fed.R.Civ.P. 54(b), and Figgie timely appealed.

## II

## ANALYSIS

A. STANDARD OF REVIEW

■ The grant of a motion for summary judgment is reviewed de novo, using the same criteria employed by the district court.[5] Summary judgment is proper if "there is no genuine issue as to any material fact" and the movant "is entitled to judgment as a matter of law."[6] When a properly supported motion for summary judgment is made, the

---

4.  Codified at 42 U.S.C. §§ 9601–9675 (1988).

5.  *United States Fidelity & Guar. Co. v. Wigginton,* 964 F.2d 487, 489 (5th Cir.1992); *Walker v. Sears, Roebuck & Co.,* 853 F.2d 355, 358 (5th Cir.1988).

6.  FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

adverse party may not rest upon the mere allegations or denials of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial to avoid the granting of the motion for summary judgment.[7]

## B. BAILEY AND UPFIELD

■ Figgie's LEQA claims were dismissed by the district court when it concluded that the LEQA did not provide a cause of action against Upfield and Bailey. We agree with that conclusion. The LEQA provides that when a determination is made that "a discharge or disposal of a hazardous substance has occurred or is about to occur which may present an imminent and substantial endangerment to health or the environment," the LDEQ secretary shall make written demand on all responsible persons to undertake remedial action in accordance with a plan approved by the LDEQ secretary.[8] Further, if making written demand upon all the responsible persons is not feasible, the LDEQ secretary "may limit his demand to those persons he deems most responsible."[9] At the time that Figgie filed suit, the LEQA provided that parties who had complied with the LDEQ secretary's written demand, *i.e.*, the "participating parties,"[10] could bring suit against "any other nonparticipating party who shall be liable for twice their portion of the remedial costs."[11] The LEQA defines a "nonparticipating party" as "a person who

refuses to comply with the demand of the secretary, or fails to respond to the demand, or against whom a suit has been filed by the secretary."[12] By the plain terms of the statute, then, the LEQA authorizes a suit by one responsible party against another responsible party only if the LDEQ secretary has made written demand upon the latter party to undertake remedial action or if the LDEQ secretary has filed suit against that party. As it is undisputed that the LDEQ secretary neither made written demand on Bailey or Upfield, nor filed suit against them, summary dismissal of Figgie's LEQA claims was appropriate.[13]

## C. THE INSURERS

At issue in this appeal is the extent of coverage, if any, of the cost of Figgie's remediation actions provided under the CGL policies issued by Travelers or INA. With minor variations, these CGL policies provide coverage for all sums Figgie becomes "legally obligated to pay as damages because of ... property damage to which [the] insurance applies."[14] All of the policies include "owned-property" exclusions which provide, with minor variations, that the policies do not apply "to property damage to ... property owned ... by the insured." Complementing those provisions are additional provisions, found in all of the policies, that are referred to as "alienated-property" exclusions. With minor variations, these exclusions specify

---

**7.** FED.R.CIV.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

**8.** LA.REV.STAT.ANN. 30:2275(A) (West 1989).

**9.** *Id.* 30:2275(D).

**10.** A "participating party" is defined as "a person who undertakes remedial action after receiving a demand from the secretary in compliance with the demand and as approved by the secretary." *Id.* 30:2272(7).

**11.** *Id.* 30:2276(G).

**12.** *Id.* 30:2272(6).

**13.** Figgie suggests that the written demand requirement has been eliminated by recent amendments to the LEQA. Specifically, Figgie points to LA.REV.STAT.ANN. 30:2276(G)(3) (West Supp.

1993), which provides, in part, "An action by a person other than the secretary shall not be barred by the failure of the secretary to demand participation in the remediation." We do not consider whether the amended statute would authorize suit under the circumstances presented by this appeal, and if so, whether the amendment would apply retroactively to Figgie's suit. Even if we were to answer these questions in the affirmative, Figgie's action still would be barred. LA.REV.STAT.ANN. 30:2276(G)(3) (West Supp.1993) (emphasis added) provides, "Such action shall be barred if the plaintiff does not make written demand on the defendant ... *at least sixty days prior to initiation of suit* based on the cause of action provided in this Subsection." As Figgie gave less than sixty days notice, its LEQA claim would be barred even under the amended language.

**14.** The policies define property damage as "injury to or destruction of tangible property."

that the policies do not apply "to property damage to premises alienated by the named insured."

The insurers argue that they are under no obligation to indemnify Figgie for its remediation costs because (1) the remedial action was performed exclusively on property formerly owned by Figgie and (2) no third party has made a claim for damages. Therefore, the insurers reason, Figgie's remediation costs are excluded from coverage by either the owned-property or the alienated-property exclusions. Figgie counters by arguing that its remediation costs are not thus excluded from coverage because the groundwater within the site suffered actual contamination—and the state owns the groundwater. Therefore, concludes Figgie, groundwater contamination does not come under the owned- or alienated-property exclusions. Alternatively, Figgie posits that even a *threat* of contamination of third-party property, including the state's groundwater, defeats the owned- or alienated-property exclusions, thereby allowing Figgie to recover from the insurers the costs of eliminating or mitigating such a threat. We address Figgie's alternative theories in turn.

### 1. *Actual Groundwater Contamination*

■ The insurers concede that the owned- or alienated-property exclusions do not exclude from coverage any costs associated with the clean up of contaminated third-party property. The insurers contend, however, that there is no competent summary judgment evidence that third-party property has been contaminated. In response, Figgie does not argue that contaminants have migrated beyond the property line; rather, Figgie argues that contaminants on the Figgie property have contaminated the groundwater within the property and that groundwater constitutes third-party property because it belongs to the state. Although the ownership of groundwater is not clearly established under Louisiana law, we need not resolve this issue here because, as urged by the insurers, Figgie has failed to provide competent summary judgment evidence of actual groundwater contamination.[15] At most, Figgie's summary judgment evidence suggests mere contact of cadmium with groundwater, but provides no basis to conclude that the cadmium was capable of leaching, *i.e.*, dissolving, into the groundwater, as is required to contaminate it.

Indeed, the summary judgment record does not reflect that groundwater within the Figgie property has even been tested.[16] Rather, to establish actual groundwater contamination, Figgie relies on evidence of contact between the groundwater and cadmium on the Figgie property.[17] Figgie urges that

---

15. In *Gregory v. Tennessee Gas Pipeline Co.*, 948 F.2d 203, 207 (5th Cir.1991), we declined to resolve the question whether the State of Louisiana owns waters above and below real property. A number of courts, however, have held that states have an ownership interest in groundwater. *E.g., Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1565 (9th Cir.1991) (applying California law). Likewise, some courts treat groundwater as a fugitive mineral which is owned by no one until capture. *E.g., Claussen v. Aetna Cas. & Sur. Co.*, 754 F.Supp. 1576, 1580 (S.D.Ga.1990). *But see Garner v. Town of Milton*, 346 Mass. 617, 195 N.E.2d 65, 67 (1964) ("[L]andowner has absolute ownership in the subsurface percolating water in his land."). At least one Louisiana court has treated groundwater as a fugitive mineral. *See Adams v. Grigsby*, 152 So.2d 619, 622–624 (La.Ct.App.), *cert. denied*, 244 La. 662, 153 So.2d 880 (1963).

16. The LDEQ apparently concluded that the cadmium had not come into contact with the groundwater and, therefore, did not conduct groundwater testing.

17. Figgie provides three pieces of summary judgment evidence, the admissibility and significance of which are in some dispute, which it insists create a genuine issue whether the cadmium in the excavated soil/sludge mixture was in contact with the groundwater. First, Figgie relies on a letter from Philip Simon, a consultant for Norris, which stated in relation to the sedimentation ponds:

> While low level residuals remain after the excavation, I believe the only environmentally significant contaminant left in the underlying soils is cadmium in the lower lagoon. There is no simple remedy for this cadmium contamination since the lower lagoon has apparently already been excavated into the water table.

Second, Figgie relies on John Halk's affidavit in which he stated that after excavating the soil/sludge mixture from the ponds, groundwater was observed seeping into the bottom of the ponds. Third, Figgie relies on Michael Herries' opinion that the ponds were recharging the upper aquifer.

actual groundwater contamination can be inferred from such contact. Such an inference is proper, however, only if evidence is proffered that the cadmium on the Figgie property was in a condition that rendered it capable of leaching into the groundwater and was thereby capable of causing actual groundwater contamination. Thus, even granting arguendo that there is a genuine factual issue whether cadmium has made contact with the Figgie property groundwater, Figgie's failure to submit *any* evidence that the cadmium on the Figgie property was in a leachable state makes summary judgment appropriate here. Absent competent summary judgment evidence of leachability, Figgie failed to carry its burden of showing the presence of a genuine issue of material fact on contamination.

In support of their summary judgment motion, the insurers submitted the affidavit of their expert, Stephen Steimle, which stated,

> [T]here is no evidence in the record that cadmium or other heavy metals at the Site would find their way into the groundwater. This could not occur unless the metal in question was in such a condition that it could leach into the ground waters and surface waters. Such a determination could only be made if Figgie or the DEQ had made an appropriate test, such as a Toxic Characteristic Leaching Procedure ("TCLP"). Only if it were established that the metal was in a "leachable" state, and a significant concentration, could one conclude that there was potential for groundwater contamination.

This affidavit served to establish the absence of a genuine issue whether the cadmium was in a leachable state, and Figgie was required to "set forth specific facts showing that there is a genuine issue for trial." [18]

In response, Figgie's expert, Michael Herries, conceded, at least inferentially, that groundwater contamination could occur only if the cadmium was in a leachable state. And Figgie did not submit or point to any evidence in the record suggesting that the cadmium on the Figgie property was in such a state. Rather, Figgie relied on Herries' supplemental affidavit which stated, with respect to a neighboring property, that "cadmium concentrations were noted which indicate the presence of dissolved (leachable) cadmium, in the groundwater." This statement was based on the results of testing done on a neighboring property,[19] which had undergone extensive remediation, including groundwater remediation. The fact that groundwater underlying a neighboring property may be contaminated with cadmium, indicating that it had been in contact with leachable cadmium, does not constitute competent evidence that the cadmium on the Figgie property was in a leachable state.[20]

▮▮▮ As Figgie failed to produce competent summary judgment evidence that the cadmium on the Figgie property was in a leachable state, Figgie has failed to show that there is a genuine issue whether cadmium on the Figgie property was capable of leaching into the groundwater. Absent competent evidence that the cadmium was in a leachable state, there is no basis upon which

18. *See* Fed.R.Civ.P. 56(e).

19. The neighboring property formerly had been owned by Figgie and had been used to conduct part of Figgie's manufacturing activities. After Figgie sold the property, the buyer continued using the property for manufacturing and generated industrial waste which was disposed of on-site.

20. Herries does state in his affidavit, "Due to the close proximity of the CEH investigation [of the neighboring property] to the [Figgie property] there is the potential that [the groundwater] contamination emanated from the [Figgie property] and may not be restricted to only the [neighboring property]." This statement is highly speculative as its only basis is the proximity of the two

properties. As such, it does not provide competent evidence that the groundwater contamination associated with the neighboring property originated from the Figgie Property. Furthermore, Herries' statement is contradicted by his previous affidavit in which he concluded that the groundwater flowed from west to east; however, the spatial relationship of the neighboring property and the Figgie property is north to south. As such, the statement does not provide sufficient evidence for a reasonable jury to find that the groundwater contamination associated with the neighboring property was caused by contact with cadmium on the Figgie property. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

a fact finder could infer that groundwater contamination occurred or was likely to occur absent the remedial action.[21]

### 2. Threat of Harm to Third–Party Property

■ Figgie contends alternatively that the cadmium on its property presented a *threat* to third-party property; specifically, the Figgie property groundwater. Figgie argues further that the costs incurred to eliminate or to mitigate a threat to third-party property are not excluded by the owned- or alienated-property exclusions. Whether such costs fall within the owned- or alienated-property exclusions has not been addressed by the Louisiana courts. The issue has been resolved, with differing conclusions, however, in a number of other jurisdictions.

In *State v. Signo Trading International, Inc.*,[22] the New Jersey Supreme Court held that a CGL policy containing an owned-property exclusion similar to the one in the instant case did not provide coverage for the costs of abating *threatened* harm to third-party property.[23] The court reasoned that, in the absence of "physical injury to or destruction of tangible property" of a third-party, the owned-property exclusion by its

plain terms operated to deny coverage for the costs "incurred to alleviate damage to the insured's own property and not to the property of a third-party," even if future harm to third-party property was thereby abated.[24] The court recognized, however, that if there had been actual injury to third-party property, the "cost of measures intended to prevent imminent or immediate future damage" to that property would not be excluded from coverage.[25]

A contrary conclusion was reached in *Intel Corp. v. Hartford Accident & Indemnity Co.*,[26] in which the Ninth Circuit applied California law to a similar owned-property exclusion. That court held that the owned-property exclusion did "not bar coverage of the costs of preventing future harm to ground water or adjacent property that might arise from contamination that has already taken place, *whether such contamination has occurred on [the insured's] property or others' property*."[27] In arriving at this conclusion, the court reasoned that "where an insured is covered for damage to a third party's property, that insured would reasonably expect coverage for efforts to mitigate that damage, even when the source of the hazard is on the insured's own property."[28] Nevertheless, the *Intel Corp.* court emphasized that, as a

---

**21.** Figgie argues that the district court abused its discretion by declining to admit a "clarifying" affidavit that, Figgie contends, establishes that the cadmium was capable of leaching into the groundwater. We find no error in the district court's refusal to admit the affidavit; Figgie made no attempt to file the affidavit within the time limit imposed by the magistrate judge. Rather, Figgie waited over one year after the deadline had passed and almost two months after the magistrate had issued his report and recommendation before seeking leave from the district judge to admit the affidavit. Absent "excusable neglect," a district court does not abuse its discretion by declining to admit an out-of-time affidavit. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 895–98, 110 S.Ct. 3177, 3192–93, 111 L.Ed.2d 695 (1990); *Farina v. Mission Inv. Trust*, 615 F.2d 1068, 1076 (5th Cir.1980). Neither is this court empowered, as Figgie suggests, to enlarge the summary judgment record on appeal with affidavits that were properly excluded by the district court. *See Lujan*, 497 U.S. at 895–98, 110 S.Ct. at 3192–93.

**22.** 130 N.J. 51, 612 A.2d 932 (1992).

**23.** *Id.*, 612 A.2d at 939.

**24.** *Id.* at 938; *accord Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 625 A.2d 1021, 1033–36 (1993) (holding, under Maryland law, that actual damage is required to third-party property to defeat owned-property exclusion).

**25.** *Signo Trading*, 612 A.2d at 939.

**26.** 952 F.2d 1551 (9th Cir.1991).

**27.** *Id.* at 1565 (emphasis added).

**28.** *Id.* at 1565–66 (citing *AIU Ins. Co. v. FMC Corp.*, 51 Cal.3d 807, 274 Cal.Rptr. 820, 839, 799 P.2d 1253, 1272 (1990) (construing the term "damages" in a CGL policy as it relates to government-mandated cleanup costs)); *accord Savoy Medical Supply Co. v. F & H Mfg. Corp.*, 776 F.Supp. 703, 708–09 (E.D.N.Y.1991) (applying New York law); *Uniguard Mut. Ins. Co. v. McCarty's Inc.*, 756 F.Supp. 1366, 1368–69 (D.Idaho 1988) (applying Idaho law); *Allstate Ins. Co. v. Quinn Constr. Co.*, 713 F.Supp. 35, 38–39 (D.Mass.1989) (applying Massachusetts law); *Jones Truck Lines v. Transport Ins. Co.*, No. 88-5723, 1989 WL 49517 (E.D.Pa. May 10, 1989) (applying Missouri law).

**1274**

factual matter, coverage extended only to the costs incurred either to remedy existing damage or to prevent future damage to third-party property; whereas costs incurred solely to remedy damage to the insured's property were not covered.[29]   Likewise, in *Savoy Medical Supply Co. v. F & H Manufacturing Corp.*,[30] a federal district court in New York held that an alienated-property exclusion did not defeat coverage when there was a threat of contamination to third-party property.[31]

As this brief and non-exhaustive review of the case law reveals, there is little consensus on the application of the owned- or alienated-property exclusions in cases involving mere threats of contamination to property. In the instant case, however, we need not and therefore do not attempt to resolve the question whether under Louisiana law such exclusions would preclude coverage for measures taken to eliminate or to mitigate a threat to third-party property. Even if we assume that (1) groundwater is third-party property and (2) coverage is not precluded in such circumstances, Figgie still would not be entitled to relief; it has failed to produce summary judgment evidence that the cadmium on the Figgie property presented a threat to the groundwater or to off-site property.

As discussed above, Figgie has, at most, created a genuine issue whether there was contact between the cadmium and the groundwater. It has failed, however, to introduce any competent evidence that the cadmium on the Figgie property was capable of leaching into the groundwater. Absent evidence of such capability, there is no basis upon which to conclude that a real threat existed. Given the dearth of summary judgment evidence to create a genuine issue whether there was a threat, or even the possibility of a threat, summary dismissal of Figgie's claims against the insurers was appropriate.

## III

### CONCLUSION

As Figgie concedes, the LDEQ secretary never made written demand on Bailey or Upfield to undertake remedial action, so Figgie is precluded as a matter of law from bringing a claim pursuant to La.Rev.Stat. Ann. 30:2276(G) to recover its remediation costs from Bailey and Upfield. Likewise, as there is no competent summary judgment evidence that third-party property has been harmed, or has even been threatened with harm, Figgie incurred remediation costs solely for damage to property formerly owned by it. Therefore, the insurers are under no duty to indemnify Figgie for its remediation costs. For the foregoing reasons, the district court's summary judgments are

**AFFIRMED.**

**29.** *Intel Corp.*, 952 F.2d at 1566. The Seventh Circuit adopted a third view of "owned property" exclusions in *Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699 (7th Cir.1994). In *Patz*, the insureds sought to recover from their insurers clean up costs that were incurred because the state ordered the insureds to remedy soil and groundwater contamination on their property. The court held that the owned-property exclusion was inapplicable because, as the court characterized the suit, the insureds were "not seeking to recover for damage to their property," but rather, they were seeking "to recover the cost of the liability that the [state] imposed on them for maintaining a nuisance." *Id.* at 705. Thus, the court found it unnecessary to determine the ownership of groundwater or the magnitude of the risk to groundwater or to off-site property. *Id.* Figgie does not argue that it is entitled to relief under a "nuisance" theory, therefore, we do not consider whether Louisiana law would allow insureds to avoid application of the owned-property exclusions under a "nuisance" theory.

**30.** 776 F.Supp. 703 (E.D.N.Y.1991).

**31.** *Accord Uniguard Mut. Ins. Co.*, 756 F.Supp. at 1369–70.