Dissent by Judge KOZINSKI.
OPINION
PER CURIAM:
This insurance coverage case arises out of the sinking of a dry dock, loaded with barrels of oil, during a typhoon bn Guam. The issues pertain to whether either of two insurance policies covered costs of damage to the dock and the clean up which was accomplished before any of the oil leaked out of the containers into the Pacific Ocean.
Guam Industrial Services, Inc. (“Guam Industrial”) owned the dry dock. At the time of the sinking, one of its insurance policies covered damage to the dock, and one covered liability for property damage caused by pollutants. After the dock sank, Guam Industrial filed a claim under each policy. The insurers denied the claims, and Guam Industrial brought suit. The district court granted summary judgment for the insurers, finding that the first policy was voidable because Guam Industrial had failed to maintain the warranty on the dock, and that the coverage under the second policy was never triggered because no pollutants were released. Guam Industrial and its CEO, Mathews Pothen, appeal. We affirm.
BACKGROUND
Guam Industrial owned and operated a dry dock called the Machinist, located in Apra Harbor, Guam. The dry dock sank on January 2, 2011. Guam Industrial had insured the dry dock under two policies: a Hull and Machinery Policy, which was underwritten collectively by Zurich American Insurance Company (“Zurich”) and Starr Indemnity and Liability Company (“Starr”), and an Ocean Marine Policy, which was underwritten by Zurich alone.
The Hull and Machinery Policy covered damage to the dry dock resulting from certain specified “perils” that included lightning, earthquake, pirates, assailing thieves, and various types of accidents and malfunctions. As a condition of coverage, the policy required Guam Industrial to obtain and maintain Navy Certification for the dry dock (“the Navy Certification warranty”). Such certification ensures that the dock has satisfied a certain level of structural integrity. It is the highest standard in the industry.
It appears, however, that Guam Industrial never obtained Navy Certification. Instead, Guam Industrial obtained “commercial” certification from a company called Heger Dry Dock, Inc. In October 2010, that commercial certification expired. Heger Dry Dock informed Guam Industrial that it would not renew the certification unless Guam Industrial undertook significant repairs. Guam Industrial then took the dry dock out of commission to conduct these repairs. The dock sank while it was undergoing the repairs.
When the dry dock sank, it took with it various containers in which were stored approximately 113,000 gallons of oil. None of the containers were breached, however. Following the incident, the Coast Guard issued a letter informing Guam Industrial that it had to remove the sunken containers holding the oil or face the possibility of fines and strict liability for any contamination to the surrounding waters. Guam Industrial recovered the containers, expending approximately $647,000; no oil ever leaked out of the containers and into the water.
*1004 Guam Industrial then filed a claim under the Hull and Machinery Policy with Zurich and Starr. The insurers denied the claim on the basis of the breach of the requirement to obtain Navy Certification.
Guam Industrial also filed a claim with Zurich under the Ocean Marine Policy. That policy generally covered “all sums which the insured shall become legally obligated to pay and shall have damages because of ... [property damage.” The policy also contained a “Pollution Exclusion Clause,” which generally excluded coverage for any damages caused by the “actual or potential discharge” of pollutants. The scope of this exclusion was narrowed by an endorsement that was attached to the policy (“Endorsement No. 10”). Together, the exclusion and the endorsement specified that the policy would cover the costs of any damage caused by “the discharge, dispersal, release, or escape” of any pollutants into the environment, provided the discharge was accidental rather than intentional. Zurich denied the claim because no actual discharge of pollutants had occurred.
After the denial of both claims, Guam Industrial brought this suit in the District of Guam, invoking diversity jurisdiction, against Zurich and Starr, seeking to recover on both policies. The district court granted summary judgment in favor of Zurich and Starr. It concluded that the Hull and Machinery Policy did not provide coverage because Guam Industrial had breached the Navy Certification warranty. The court rejected Guam Industrial’s position that Zurich and Starr had to demonstrate that the breach caused the sinking of the dry dock, because applicable law required strict compliance with certification requirements.
The district court further concluded that the Ocean Marine Policy coverage for property damage caused by pollution was never triggered because the oil never left the containers. There was no “discharge, dispersal, release, or escape” of any pollutant into the waters of Apra Harbor, and hence no property damage within the terms of the policy.
Guam Industrial now appeals.
HULL AND MACHINERY POLICY AND THE LACK OF CERTIFICATION
The Hull and Machinery Policy covering damage to the dry dock was underwritten by both Zurich and Starr, and required, as a condition of coverage, that Guam Industrial obtain and maintain Navy Certification for the dry dock. Guam Industrial breached the warranty because the dry dock was never Navy Certified. Deciding whether the insurance policy mandates strict compliance with its requirement of Navy Certification requires interpretation of the policy.
To interpret a marine insurance policy, we usually must first determine whether to apply state or federal law. See Wilburn Boat Co. v. Fireman’s Fund Ins. Co., 348 U.S. 310, 313-14, 75 S.Ct. 368, 99 L.Ed. 337 (1955). Generally, courts are to “apply state law unless an established federal rule addresse[s] the issues raised, or there [is] a need for uniformity in admiralty practice.” Yu v. Albany Ins. Co., 281 F.3d 803, 808 (9th Cir.2002). That being said, we do not need to determine whether to apply federal or state law in this instance because both sources of law lead to the same rule: that marine insurance policy warranties are to be strictly construed. The federal rule, if one in fact exists,[1] is *1005 that “admiralty law requires the strict construction of express warranties in marine insurance contracts; breach of the express warranty by the insured releases the insurance company from liability even if compliance with the warranty would not have avoided the loss.” See Lexington Ins. Co. v. Cooke’s Seafood, 835 F.2d 1364, 1366 (11th Cir.1988). The state majority rule also provides that express warranties in marine insurance policies should be strictly construed. See Yu, 281 F.3d at 808-09.
Guam’s courts have not yet spoken on this specific issue, and where state courts are silent, “federal court[s] must make a reasonable determination of the result the highest state court would reach if it were deciding the case.” Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., 306 F.3d 806, 812 (9th Cir.2002) (internal quotation marks omitted). We think that it is reasonable to conclude that the Supreme Court of Guam would likely follow the majority rule. Guam’s insurance statutes are derived from California law, which requires strict compliance with warranties when they are material. Cal. Ins.Code § 447. Ultimately, whéther derived from federal admiralty law or state law, we conclude that the law requires strict compliance with marine insurance policy warranties, even when the breach of the warranty did not cause the loss. Applying that law to these facts, there is no question that Guam Industrial failed to comply with the Navy Certification warranty.
Guam Industrial contends that the insurers waived their right to demand strict compliance with the Navy Certification warranty because they had accepted commercial certification. Under Guam law, conduct that is inconsistent with an intent to demand strict compliance may constitute waiver. See Guam Hous. & Urban Renewal Auth. v. Dongbu Ins. Co., Ltd., 2001 Guam 24, ¶ 18, 2001 WL 1555206. The district court nevertheless correctly granted summary judgment in favor of the insurers, because even if they had waived the insistence on Navy Certification, the dry dock lacked even commercial certification when it sank. Though the insurers may have waived their right to insist on the Navy'Certification warranty, they did not waive their right to insist on at least commercial certification. See id. at ¶ 16 (waiver must be intentional).
OCEAN MARINE POLICY
Zurich was also the insurer on an Ocean Marine .Policy, covering liability for property damage caused by pollutants. The Ocean Marine Policy, in material part, limits coverage to claims “arising out of the discharge, dispersal, release, or escape of ... oil ... or pollutants into or upon ... any watercourse or body of water.” It is undisputed that no oil leaked out of the containers and into the water in the harbor. Thus, the policy’s coverage could be triggered only if the sinking of the containers constituted a “discharge, dispersal, release, or escape” of oil or pollutants into the waters of the Bay. It did not.
Cases in this Circuit that deal with similar property damage insurance clauses involving pollution have arisen in situations where pollutants had unquestionably leaked into the environment. See, e.g., Aeroquip Corp. v. Aetna Cas. & Sur. Co., 26 F.3d 893, 893 (9th Cir.1994) (dealing *1006 with the leakage of 7,500 gallons of diesel fuel into the soil, but coverage denied because leakage not “sudden and accidental” as required under the policy); Intel Corp. v. Hartford Acc. & Indem. Co., 952 F.2d 1551, 1559 (9th Cir.1991) (insurer’s reliance on pollution exclusion not waived in connection with hazardous waste solvents that had slowly leaked out of storage tanks and into the groundwater and soil). Thus, we have had no occasion to consider whether the disposal into the environment of containers holding contaminants can constitute a discharge of pollutants, even if no contaminants leaked into the environment.
Contract law requires that we give unambiguous[2] insurance policy terms “their ordinary meaning.” Klamath Water Users Protective Ass’n v. Patterson, 204 F.3d 1206, 1210 (9th Cir.1999) (“Whenever possible, the plain language of the contract should be considered first.”). Under the ordinary meaning of Endorsement No. 10, Zurich would provide coverage of Guam Industrial’s damages only if either (1) oil or (2) pollutants escaped or were discharged, dispersed, or released into the water. We agree with Guam Industrial’s Opening Brief, where it outlined the “ordinary meaning” for the insurance policy terms:
The plain ordinary meaning of discharge is the release of something from “confinement, custody, or care”, [sic] Webster’s Ninth New Collegiate Dictionary (1989). A dispersal is the “act or result of dispersing”, [sic] and disperse includes the meaning “to spread or distribute from a fixed or constant source”, [sic] Id. An escape is the “act of escaping or the fact of having escaped: as ... leakage or outflow esp. of steam or a liquid” and release includes “to set free from restraint”, [sic] Id.
Bl. Br. 39. Applying these definitions to the facts of this case, it is clear that barrels or containers were discharged, dispersed, and released, but that oil was not. In fact, all parties agree that the oil remained sealed inside its containers at all relevant times. Thus, under the ordinary meaning of Endorsement No. 10, Zurich’s coverage cannot be said to have been triggered by a “discharge, dispersal, release, or escape” of oil.
Further, sealed barrels, regardless of their contents, do not qualify as “pollutants” under the plain meaning of Endorsement No. 10. Endorsement No. 10 provides a list of specific substances whose “discharge, dispersal, release or escape” triggers the clause. The substances listed are “smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substance or derivative (including any oil refuse or oil mixed wastes).” These specific substances are then followed by the catchall terms “or other irritants, contaminants or pollutants.” The sealed barrels discharged in this case clearly do not qualify as any of the specified substances. Thus, the only question is whether sealed barrels fall within the catchall terms. “It is ... a familiar canon of statutory construction that [catchall] clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated.” Paroline v. United States, — U.S. —, 134 S.Ct. 1710, 1721, 188 L.Ed.2d 714 (2014) (alteration in original) (quoting Federal Maritime Comm’n v. Seatrain Lines, Inc., 411 U.S. 726, 734, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973)). When applying this canon of construction to the Endorsement, *1007 it is clear that barrels and other containers are not similar to the listed substances. Instead, the Endorsement limits the term “pollutants” to chemicals and other hazardous substances. Solid, non-hazardous items, such as barrels, are not similar in type to the specifically enumerated hazardous substances. Thus, under the ordinary meaning of the policy terms, a sealed barrel cannot be an “irritant[ ], contaminant[ ] or pollutant.” Neither oil nor pollutants were discharged, dispersed,- or released, nor did they escape, into the waters of Apra Harbor in this case.
The dissent argues that we err by not construing the Ocean Marine Policy in favor of the insured (Guam Industrial). As the authority cited by the dissent recognizes, “should ambiguities exist in the language of the 'policy provisions, they are to be liberally construed in favor of the insured” to “protect[ ] ... the objectively reasonable expectations of the insured.” Yasuda Fire & Marine Ins. Co. v. Heights Enterprises, 1998 Guam 5 ¶ 12-13, 1997 WL 1047919 (emphasis added) (internal quotation marks omitted). However, we find no ambiguity in the terms of the Ocean Marine Policy. Without an ambiguous term or provision, we have nothing to “construe” in favor of the insured. Surely, the dissent cannot intend to suggest that any time an insurer and an insured have a genuine disagreement concerning an insurance contract provision,' a reviewing court must accept the insured’s interpretation. That contention has absolutely no support in our precedent. See Klamath Water Users Protective Ass’n, 204 F.3d at 1210 (“The fact that the parties dispute a contract’s meaning does not establish that the contract is ambiguous.... ”).
Instead, our precedent clearly requires that we apply the ordinary meaning of the contract terms. See, e.g., id. at 1210. Utilizing Guam Industrial’s own “ordinary meanings” of the terms in Endorsement No. 10, we conclude that Guam Industrial’s damages were not covered by the Ocean Marine Policy.
At least one other Circuit has expressly held that the relevant act of pollution for purposes of similar insurance coverage occurs when the contaminant leaks out of a container, not when the container is disposed of. In Patz v. St. Paul Fire & Marine Ins. Co., 15 F.3d 699, 702 (7th Cir.1994), the Seventh Circuit addressed a similar insurance clause that provided coverage for accidental “discharge, dispersal, release, or escape” of contaminants or pollutants. The insured had put sludge into barrels and then buried the barrels. Id. at 703. The insurer had contended the burial constituted the pollution and was not accidental. The court held that the relevant act of pollution occurred not when the barrels were buried but when the sludge leaked out of the barrels. Id. (“As the barrels themselves were not contaminants, no discharge of contaminants into the soil occurred until the barrels leaked or broke.”).
We agree with the Seventh Circuit that the containers themselves are not pollutants. Just as there was no pollution in Patz when the barrels were buried in the ground, there was no pollution in this case when the dry dock sank and the containers fell into the water. Under the pollution clause in the insurance policy, pollution would have occurred only when and if the oil leaked out of the containers, which'it did not.
The district court correctly ruled that since there was no actual discharge of pollutants, even though the containers of oil were submerged after the sinking, Guam Industrial’s costs of retrieving the containers from the sea were not covered by the policy’s allowance of coverage for *1008 cleanup after the “discharge, dispersal, release, or escape” of pollutants.
CONCLUSION
The district court correctly granted summary judgment in favor of the defendant insurance companies on both the Hull and Machinery Policy, and on the Ocean Marine Policy.
AFFIRMED.

. In Wilburn Boat Co. v. Fireman’s Fund Ins. Co., the Supreme Court declared that no established federal rule addressed marine insurance policy warranty clauses, and that the *1005 clauses should be interpreted using state law. 348 U.S. at 314-16, 75 S.Ct. 368. Since Wilburn Boat, however, a few circuits have announced the “federal rule” identified above. See Lexington Ins. Co. v. Cooke’s Seafood, 835 F.2d 1364, 1366 (11th Cir.1988); see also Lloyd’s of London v. Pagan-Sanchez, 539 F.3d 19, 24 (1st Cir.2008). This circuit has neither announced a federal rule nor disclaimed such a rule.

. No parly argues (unlike the dissent) that the language of Endorsement No. 10 is ambiguous.