KOZINSKI, Circuit Judge,
dissenting in part:
If you slap a silk suit on a monkey, you still won’t want to take it to the prom. And if you pour crude oil into a barrel, you still won’t want it in your hot tub.
Zurich’s Ocean Marine Policy covers claims “arising out of the discharge, dispersal, release, or escape of ... oil ... or pollutants into ... any watercourse or body of water.” Guam Industrial paid for this coverage and Zurich happily accepted the premiums. (Insurance companies seldom have trouble with this part of the bargain.) What risk was Zurich paid to assume? The risk that something nasty would get into the water and Guam Industrial would be under a legal obligation to clean it up. That’s just what happened here: Some very nasty stuff — barrels containing over 100,000 gallons of industrial oil — plunged into the harbor when the dry dock sank. To no one’s surprise, the Coast Guard immediately issued Guam Industrial a clean-up notice. This wasn’t an invitation to the prom; it was a clean-up- or-else-we’ll-do-it-ourselves-and-make-you-pay-through-the-nose notice. Guam Industrial did what the law required of it and, thanks to its careful efforts, none of the oil mixed with the water. Why should Zurich’s obligation to pay for the clean-up turn on the largely fortuitous circumstance that none of the barrels le'aked right away? Sooner or later the monkey will rip off the silk suit and the barrels at the bottom of the ocean will release- gunk where the fishes live. Which is no doubt why the Coast Guard gave Guam Industrial a notice to clean up the barrels of oil but not the other debris from the sinking.
Like the majority, I start with the dictionary definitions of “discharge,” “dispersal,” “release” and “escape” to ascertain their ordinary meaning. A “discharge” is a “release from confinement, custody, or care.” Merriam-Webster’s Collegiate Dictionary 356 (11th ed.2003). A “dispersal” is the act of “spreading] or distributing] from a fixed or constant source.” Id. at 361. A “release” is the act of “set[ting] free from restraint [or] confinement,” id. at 1051, and an “escape” is “flight from confinement,” id. at 425. The majority concludes that “barrels or containers were discharged, dispersed, and released” from the dry dock. Op. at 1006. It then follows that the contents of those barrels were likewise “discharged, dispersed, and released” from the dry dock.
Let’s say you place your cell phone in your backpack while hiking, and the backpack falls into a crevice and can’t be, recovered. You’d certainly be right in claiming that you lost your cell phone, even though the phone is still inside your backpack. What matters is that the backpack and its contents are no longer in your control. If the phone was insured against loss, no insurance company (except maybe Zurich) would claim that the phone isn’t lost because it’s still inside your backpack.
Endorsement No. 10 lists the “discharge, dispersal, release, or escape” of “smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids- or gases, waste materials, oil or other petroleum substance or •derivative ... or other irritants, contaminants or pollutants” as hazards covered by the policy. The majority claims that *1009 “[s]olid, non-hazardous items, such as barrels, are not similar in type to the specifically enumerated hazardous substances” in the Endorsement. Op. at 1007. But we’re not talking here about empty barrels; we’re talking about barrels filled with a known pollutant. Nor are we talking about indestructible barrels — something that exists only in graphic novels. In the real world, barrels are merely temporary containment devices that will corrode or break over time. At that point, whatever lurks inside — oil, acid, arsenic, radioactive waste, you name it — will spill out.
Of course, we must read the catchall clause, “or other irritants, contaminants or pollutants,” as “bringing within a [contract] categories similar in type to those specifically enumerated.” Paroline v. United States, — U.S. —, 134 S.Ct. 1710, 1721, 188 L.Ed.2d 714 (2014) (internal quotation marks omitted). But are oil barrels all that different from “waste materials” or the very substance contained within the barrels — industrial oil? Once underwater, barrels filled with oil pose a threat to the environment and will eventually cause the same kind of harm. Would you let your kids swim in waters where there are submerged barrels filled with toxic waste? Would you drink from a well in which such barrels were dropped? Most people wouldn’t. The Coast Guard certainly considered the barrels sufficiently polluting to order that Guam Industrial remove them.
The majority misplaces its reliance on a Seventh Circuit case that held for the insureds. See Patz v. St. Paul Fire & Marine Ins. Co., 15 F.3d 699 (7th Cir.1994). The insureds in Patz buried sealed barrels of paint sludge on their property. A few years later, the sludge leaked from the barrels and the Patzes were ordered to clean up the mess. Id. at 702. They sought reimbursement for their clean-up costs under a policy that covered the accidental “discharge, dispersal, release or escape” of contaminants or pollutants. The insurance company denied coverage, arguing that the discharge was not accidental because the Patzes had buried the barrels of sludge intentionally. Id. The Seventh Circuit did say that “the barrels themselves were not contaminants” at the time they were buried, and that “no discharge of contaminants into the soil occurred until the barrels leaked or broke,” id. at 703, but it did so while construing the insurance contract — as it was required to do— in favor of the insureds. It acknowledged that “[a]t first and even second glance, [the insurance company’s] interpretation ... has a great deal to recommend it. Excluded from coverage, on the most natural reading of the clause, are all discharges (etc.) of waste materials, except those that are sudden and accidental.” Id. Construing the Patzes’ burial of the barrels as an act of pollution may have been the more plausible interpretation, but the Seventh Circuit adopted the less plausible interpretation which favored the insureds.
The real lesson of Patz, which my colleagues overlook, is that when it comes to construing insurance contracts, the insured need not have the best interpretation or even one just as good as the insurer’s. The insured’s interpretation need only be plausible. “A well settled general principle of insurance law is that ... ambiguities ... are to be liberally construed in favor of the insured.” Yasuda Fire & Marine Ins. Co. v. Heights Enters., 1998 Guam 5 ¶ 12, 1997 WL 1047919. An ambiguous term must be interpreted “in the manner in which the promisor believed the promisee understood it at the time of its making” so as to “protect[ ] ... the objectively reasonable expectations of the insured.” Id. at ¶ 13 (internal quotation marks omitted). The majority has hung this venerable maxim of insurance law by its tail.
*1010 Guam Industrial argues that the language of Endorsement No. 10 unambiguously covers the sinking of the oil barrels, while Zurich argues that the language unambiguously excludes such coverage. Where “both parties claim a contract is unambiguous but advance different rational arguments as to its meaning, a court is not limited by the parties’ failure to specifically assert ambiguity.” Minex Res., Inc. v. Morland, 467 N.W.2d 691, 696 (N.D.1991); see also Comm’r of the Gen. Land Office of Tex. v. SandRidge Energy, Inc., 454 S.W.3d 603, 612 (Tex.App.2014) (“We may conclude that a contract is ambiguous even when, as is the case here, the parties do not assert ambiguity.”).
The cost of fishing out submerged oil barrels at the command of the Coast Guard is the kind of risk for which dry dock owners would seek coverage when buying insurance. It doesn’t matter whether oil mixes with water immediately or sometime later; the risk is the same. After all, dry dock owners have every reason to expect that the Coast Guard will order the immediate removal of barrels filled with pollutant, whether or not they ruptured when the dry dock sank. See 33 U.S.C. § 1321(c)(1)(A) (requiring the President, acting through the Coast Guard, to ensure “mitigation or prevention of a substantial threat” of an oil spill).
The policy’s pollution exclusion clause is designed to exclude coverage for pollution occurring during the normal course of an insured’s business. See Minerva Enters., Inc. v. Bituminous Cas. Corp., 312 Ark. 128, 851 S.W.2d 403, 404 (1993) (“the [pollution] exclusion is intended to prevent persistent polluters from getting insurance-coverage for general polluting activities”); Thompson v. Temple, 580 So.2d 1133, 1134-35 (La.Ct.App.1991) (“Pollution exclusion clauses are intended to exclude-coverage for active industrial polluters, when businesses knowingly emitted pollutants over extended periods of time.”) (citing cases); Molton, Allen & Williams, Inc. v. St. Paul Fire & Marine Ins. Co., 347 So.2d 95, 99 (Ala.1977) (“It is believed that the intent of the ‘pollution exclusion’ clause was to eliminate coverage for damages arising out of pollution or contamination by industry-related activities.... The pollution exclusion was no doubt designed to decrease the risk where an insured was putting smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into the environment.”). Losing control of pollutants as a result of an unexpected and unintended event — here, the sinking of the dry dock during high surf conditions — is nothing like the types of events contemplated by the pollution exclusion clause. Endorsement No. 10 clears up any doubt by specifying that “[t]his [pollution] exclusion shall not apply” where “the occurrence [that] arose from Maritime Operations” was “caused by some intervening event neither foreseeable nor intended by the insured.” This is just what happened here.
No rational dry .dock owner would buy a policy that covers government-ordered pollution clean-up if containment vessels filled with toxic waste break apart upon sinking but not if they remain intact. It’s absurd. Zurich’s denial of coverage is the type of slimy conduct that gives insurance companies a bad name. This opinion should serve as fair warning to those who would throw away good money doing business with Zurich.