Botsford, J.
Introduction
We are at the final phase of this very long declaratory judgment action. The case encompasses the effort to obtain liability insurance coverage by the plaintiffs (the Trustees) who are trustees of a trust which for many years owned real property in Newton, Massachusetts (the Property). In particular, the Trustees have sought to establish that they were entitled to defense and indemnity coverage from five different insurance companies which the Trustees believed had insured the Property at various points during the 1960’s, 1970’s and 1980’s. The coverage sought related to a lawsuit brought against the Trustees in 1989 by the purchasers of the Property; that lawsuit, which raised claims of environmental contamination, was settled in June 1991 for $425,000.
After summary judgment motions in this case on the defendant insurers’ duty to defend and related matters, all the defendants except Royal Insurance Company of America (Royal) have now settled all claims with the Trustees. With respect to Royal, a jury-waived trial was held before me in late 1993 on the issue of whether two of its predecessor companies had issued policies for the Trust (the lost policies trial). In a memorandum of decision issued in the spring of 1994, I concluded that Royal’s predecessors had issued to the other Trustees or their trust four different policies which collectively covered the period from October 30, 1969 through October 4, 1977.
In November 1994, a trial was held before a jury to determine factual issues that would govern resolution of the question whether Royal was responsible for indemnifying the Trustees in connection with the settlement of the purchaser’s underlying lawsuit. The jury in that case answered special questions which were intended to encompass the factual issues in dispute. Finally, in December of 1994, a jury waived trial was held before me on the Trustees’ claim to recover $17,886.70 in unreimbursed defense costs (the fees trial).
In this memorandum of decision, I address the question whether, on the basis of the jury’s answers, the Trustees are entitled to a declaratory judgment in their favor on the indemnification question, and, if so, the amount of indemnity Royal is obligated to provide. I also consider Royal’s liability to reimburse the Trustees for the contested defense costs. For the reasons discussed below, I conclude that the Trustees are entitled to indemnity coverage from Royal, but with offsets for the settlements received from other insurers; and that Royal is responsible for reimbursing the Trustees $15,067.70 in unpaid defense costs.
Background
The record of this case reveals the following undisputed facts, to many of which the Trustees and Royal have stipulated. The Trustees served as trustees of the Security Mills Realty Trust (the Trust). From 1922 to 1985, the Trust owned the Property. From 1922 until late 1968 or early 1969, the Trust leased the Property to a related family corporation which used the Property for the manufacture of textiles. In the 1930’s, the corporation installed two underground oil storage tanks at the Property, including a 15,000 gallon tank to store Bunker C oil (also known as No. 6 fuel oil). This tank was in use continuously at the Property from the date of installation until sometime in the first half of 1969, and it was filled at least on a weekly basis. The textile manufacturing operations at the Property-required large scale pumping of water, and as a result, the groundwater table around the tanks was approximately 20 feet lower than its natural elevation at least until the manufacturing operations stopped.
In 1985, the Trustees sold the Property to Sandy Bloomberg, Leo Kahn and Paul K. Daley, who took title in the name of Security Mills Limited Partnership (SMALP). In 1988, SMALP demolished the existing textile mill building on the Property in the process of redeveloping the Property as residential condominiums. In the course of the demolition, SMALP discovered the existence of the underground oil storage tanks and oil contamination in the soil surrounding the tanks, and, in addition, the existence of asbestos on the Property.
Most of the oil that caused the contamination was released before late 1968 or early 1969. The release(s) took place before the textile mill at the Property stopped pumping large quantities of ground water.
In March 1989, SMALP, as the then owners of the Property, submitted a waiver application, preliminary assessment report and interim site classification form to the Massachusetts Department of Environmental Quality Engineering, now known as the Department of Environmental Protection (DEP). The remedial action plan was prepared by McPhail Associates, Inc., an environmental engineering and consulting firm hired by SMALP to assess the extent of the contamination. On May 4, 1989, DEP approved SMALP’s waiver application. Approximately 150 tons of oil-contaminated soil was excavated and removed from the Property-under the supervision of McPhail Associates, Inc.
SMALP brought a civil action against the Trustees in April 1989 in the Middlesex Superior Court. In its complaint, SMALP alleged that it had incurred substantial expenses in assessing the nature and extent of damage to the Property, to surrounding properties and to the groundwater; in containing and removing *274 the oil and asbestos; and by virtue of the decrease in value of the Property resulting from the contamination. SMALP sought recovery for these damages under G.L.c. 21E, §§4 and 5, and G.L.c. 93A, §11.
The Trustees notified the various insurance companies which they believed had issued, over the years, liability policies to the Trust that would apply to the SMALP suit. Each of the companies refused to defend the Trustees in the SMALP suit except Wausau Underwriters Insurance Company (Wausau). Wausau denied it had an obligation to defend, but nonetheless agreed to advance to the Trustees their legal fees and expenses in defending the SMALP suit up to a maximum of $150 per hour. The Trustees retained three attorneys at three different firms to represent their respective interests.
In June 1991, the Trustees settled the underlying SMALP action for $425,000. By the time of settlement, Wausau had paid $261,902.84 in legal fees and expenses in defending the Trustees in the SMALP suit. The Trustees themselves paid $ 17,886.70 in legal fees and expenses, representing the excess charged to the Trustees over the $150 per hour paid by Wausau.
The Trustees brought the present declaratory judgment action against the five insurance companies they believed were responsible, in whole or in part, to provide coverage for the SMALP litigation. The issues in this case have been resolved in phases. In brief summary, in October 1991, I determined that the Trustees were entitled to partial summary judgment against the defendant Lumbermens Mutual Casualty Company on its duty to defend the Trustees in the SMALP case. Summary judgment was denied as to all other defendant insurers, including Royal, because none of the other insurers’ policies had been located. By December 1993, only Royal contested the existence of insurance policies, and the lost policies trial took place, jury waived, as described in the introduction above. In October 1994, having earlier concluded Royal had issued policies to the Trust or Trustees, I ruled that the Trustees were entitled to partial summary judgment against Royal on the duty to defend in the SMALP action.
As indicated at the outset of this memorandum, by November 1994, the only defendant insurer which had not settled with the Trustees was Royal. The jury trial held in that month focused on the issue of Royal’s obligation to indemnify the Trustees for the $425,000 they had paid in settlement of the SMALP suit. Evidence was introduced concerning, inter alia, the nature and extent of oil contamination on and off the Property. The jury answered special questions as follows:
• Was the No. 6 (Bunker C) fuel oil that was discharged or released on to the 24 Monroe Street property (“the Site") released in a sudden and accidental manner? No. (Question 1.)
• Was there any contamination of the groundwater at the Site on or before June 10, 1991 [the date that the Trustees settled the SMALP action]? Yes. (Question 2.)
• Had the contamination caused by the release of the fuel oil migrated beyond the boundaries of the property by July 10, 1991? Yes. (Question 3.)[3]
• What portion of the Trustees’ $425,000 settlement with SMALP is properly allocable to:
a. asbestos removal from the Property $0
b. costs of remediation of existing contamination on the Property other than asbestos $250,000
c. the costs of remediation of existing contamination off the Property other than asbestos $0
d. the costs of future remediation of contamination on the Property (Other than asbestos) $175,000
e. the costs of future remediation of contamination off the Property (other than asbestos) $0
f. the costs of cleaning up the Property for the purpose of continuing with SMALP’S condominium development project $0
g. diminution of the property value of the Property purchased by SMALP $0
h. carrying costs $0
i. lost opportunity costs $0
j. SMALP’S attorneys fees $0
k. interest and litigation costs É_Q
TOTAL $425,000
(Question 6.)
• If the SMALP action against the Trustees had gone to trial, would SMALP have been able to prove that it had incurred or was reasonably expected to incur more than $425,000 in costs to assess then-existing and future contamination on the properly, or to remediate then-existing or future contamination on the property, in order to comply with the requirements of DEP and the Massachusetts Contingency Plan? Yes. (Question 7.)
• If SMALP’s case against the Trustees had gone to trial, would SMALP have been able to prove that it had incurred or was reasonably expected to incur more than $425,000 in costs to remove oil-contaminated soil on the Property for the purpose of preventing present and/or future groundwater contamination, or of preventing present and/or future off-site migration of contaminants? Yes. (Question 8.)
• Was the property damage that occurred at the property as a result of discharges of No. 6 fuel oil either expected or intended by the Trustees? No. (Question 9.)
*275 Discussion
I. Does the $425,000 Paid by the Trustees Come Within the Scope of Any of the Royal Policies?
The jury’s answer that none of the releases of No. 6 fuel oil was sudden and accidental means that any of the Royal policies at issue with a pollution exclusion clause is not implicated; this is a premise that neither side contests. At the 1993 lost policies trial, I concluded that three of the four policies Royal’s predecessor companies had issued to the Trust or Trustees did contain pollution exclusion clauses. The exception is Policy No. 51668, issued by Royal’s predecessor Globe Indemnity Company, and covering the period of October 30, 1969 to October 30, 1972.
Policy No. 51668 provides that the insurer will pay on behalf of the insured “all sums which the insured shall become obligated to pay as damages because of . . . property damage ... caused by an occurrence and arising out of the ownership ... of the insured premises [the property].”[4] Royal does not question that the $425,000 paid in settlement qualifies as “damages” on account of “property damage,” but nonetheless argues that this policy cannot be found to cover the SMALP settlement. Royal reasons that the parties’ stipulation of facts (summarized above, see pp. 3-4) makes clear all releases of oil occurred before October 30, 1969— the beginning date of the policy — and that under the “injury-in-fact” “trigger” theory Royal claims should be applied here, the “injury-in-fact” occurred in 1961, when, according to the testimony of one of Royal’s expert witnesses at trial, the 15,000 gallon tank would have failed and begun releasing oil.
Royal’s argument must be rejected. The policy at issue is in substance a comprehensive general liability policy. The policy, like most of its kind, defines the term “occurrence” as “an accident, including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured” (emphasis supplied). While the parties stipulated that most of the No. 6 fuel oil was released before October 1969, the evidence is also clear that none of the contaminated soil or groundwater on the property had been cleaned up or removed before 1988 or 1989. Accordingly, during the policy period of 1969-1972, the property remained continuously exposed to the contaminating fuel oil. “The ‘occurrence’ is the ‘injurious exposure’ to the hazardous material during the policy periods. The ‘property damage’ is the continued contamination of soil and groundwater on the site during the policy periods caused by the release of the hazardous material.” Trustees of Tufts University v. Commercial Union Ins. Co., 415 Mass. 844, 848 (1993).[5] As in the Tufts case, it is not necessary to determine which “trigger” of coverage applies. See id. at 854. The settlement paid by the Trustees is covered by the general terms of Royal’s policy No. 51668.
II. Is Coverage of the Settlement Excluded Under the Owned Property or Alienated Premises Clause of the Applicable Policy?
Royal’s policy provides that the insurer “will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence...” It then sets forth a number of exclusions. In particular, the policy states:
Exclusions
This insurance does not apply:
(i) to property damage to
(1) property owned or occupied by or rented to the insured,
(2) property used by the insured, or
(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;[6]
(j) to property damage to premises alienated by the named insured arising out of such premises or any part thereof;
.. [7]
Royal has always taken the position that either the owned property or the alienated premises exclusion applies to the entire $425,000 settlement paid by the Trustees because all contamination remediation efforts and related expenses were confined to the Property itself, and there has never been a claim made for property damage by any abutting property owner. Put in the language of the policy, Royal’s argument is that at best the settlement constitutes “damages” because of “property damage” only to the insured Property, and since the Property was owned and then alienated by the Trustees, coverage is therefore excluded.
The Trustees have consistently contended, however, that it is irrelevant where the property damage occurred, because the Trustees are not attempting to recover for the cost of restoring or improving the Property — a “first party” claim. Rather, they seek coverage of their obligation to pay damages on account of a claim of liability raised against them by a third party, namely, SMALP. Moreover, the damages relate to cleanup costs effectively imposed on them by yet another third party, namely, the DEP. In such circumstances, the Trustees assert, neither the owned property nor the alienated premises exclusion has any application.
As the discussion below indicates, I do not accept entirely either party’s position. However, I do conclude the owned property and alienated premises exclusions do not bar insurance coverage for the SMALP settlement amount.
A. I start from the premise that if either of the exclusions at issue applies here, it is the owned property exclusion only, despite the fact that the Trustees sold the property to SMALP. Royal’s insurance policy *276 provides coverage for damages the insured must pay because of “property damage” caused by an occurrence. “Property damage” is defined in relevant part as “physical injury or destruction of tangible property which occurs during the policy period . . . ’’(emphasis supplied). Thus the focus is on an “occurrence” and physical injury or destruction of property during the time the policy was in effect, which was 1969 to 1972. There is no dispute that during these years, the Trustees owned the property; the sale to SMALP did not occur until 1985. Cf. McKellar v. Northern Ins. Co., 837 P.2d 860-61 (Nev. 1992) (alienated premises clause did not excuse insurer’s duty to defend insured in action alleging negligent construction of apartment complex where alleged negligence occurred before sale).[8]
B. There are no Massachusetts appellate decisions that offer much guidance on how to apply the owned property exclusion in this case. In Trustees of Tufts University v. Commercial Union Ins. Co., supra, 415 Mass. at 852-53, the court considered whether the owned property exclusion in the applicable insurance policy would eliminate the insurer’s duty to defend Tufts in a suit brought by a subsequent owner of certain property to recover environmental cleanup and response costs. The court concluded the exclusion did not remove the defense obligation, since the relevant facts did not establish that Tufts itself had actually owned the contaminated property. Perhaps one might read into this discussion a form of negative pregnant: that if it had been shown Tufts actually owned the property in question, the owned property exclusion would have applied. On reflection, I hesitate to do so, however, because the court’s brief discussion of the issue is clearly confined to the question whether Tufts or its wholly owned subsidiary was the prior owner. I thus turn to decisions of courts in other jurisdictions.
Most of these decisions involve a situation where the insured is required to pay for the remediation of environmental contamination on its property as a result of an order issued by a state or federal environmental protection agency, and seeks insurance coverage for the cleanup costs. The cases seem generally in agreement that where the insured shows the contamination on its property has spread to other property owned by abutters, the owned property exclusion does not apply to bar coverage of response costs designed to remediate or prevent further migration of those contaminants, even where the actual remediation work is confined to the insured’s property, because the costs relate to property owned by another. See, e.g., Gerrish Corp. v. Universal Underwriters Ins. Co., 947 F. 2d 1023, 1030, 1031 (2d Cir. 1991).[9]
The Trustees argue that where an insured is ordered involuntarily to pay cleanup costs by a governmental agency (or presumably any third party) — as the Trustees claim they were by virtue of the SMALP suit and the underlying requirement to comply with the Massachusetts Contingency Plan — the owned property exclusion does not bar coverage, regardless of whether contamination is confined to the insured’s property or has migrated elsewhere. See, e.g., Patz v. St Paul Fire & Marine Ins. Co., 15 F. 3d 699,705 (7th Cir. 1994) (applying Wisconsin law).[10] Accord, Anderson Development Co. v. Travelers Indem. Co., 49 F.3d 1128, 1134 (6th Cir. 1995) (applying Michigan law); Joslyn v. Liberty Mut Ins. Co., 23 F.3d. 1212, 1214 n. 1 (7th Cir. 1994) (applying Illinois law). See Unigard Mut Ins. Co. v. McCarty’s, Inc., 756 F.Supp. 1366, 1369, 1370 (D. Idaho 1988).
There seems much to recommend the approach taken by Patz and similar decisions. It is simple, and it is based on the recognition that generally, the owned property exclusion is meant to preclude claims that are more properly viewed as property damage claims alone rather than liability claims of a third party. See K.S. Abraham, Environmental Liability Insurance Law at 163 and n. 54 (1991). The difficulty, however, is that the approach appears to ignore some of the plain language of the insurance policy.[11]
As quoted above, Royal’s policy provides it will pay on behalf of the insured “damages because of. . . property damage to which this insurance applies, caused by an occurrence ...” and then immediately proceeds to state, “(this insurance does not apply" to, inter alia, property damage to property that is owned by the insured. (Emphasis supplied.) The court’s discussions in Patz and in most of the other cited cases focus exclusively on the language of the owned property exclusion, namely, that it excludes coverage for property damage to property owned by the insured; they then conclude that since the issue is liability coverage, not properly damage coverage, the exclusion has no effect. See, e.g., Patz, 15 F.3d at 705. With one exception that presents a somewhat incomprehensible analysis, see Unigard Mut. Ins. Co. v. McCarty’s Inc., supra, 756 F.Supp. at 1369 and n.3, the decisions do not consider the owned property exclusion in conjunction with the general insuring provision of the policy, which confines coverage to damages incurred because of “property damage to which this insurance applies.” When that language is factored in, it is very difficult to understand how the owned property exclusion would not bar coverage where the damages in question relate only to “property damage” to the insured’s own property: the policy specifies that it covers liability related to property damage to which “this insurance” applies, and the policy then expressly states that “this insurance” does not apply to properly damage to owned property. See American Home Assur. Co. v. Libbey-Owens-Ford Co., 786 F.2d 22, 26-28 (1st. Cir. 1986); Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 405 A. 2d 788, 792 (1979) (discussing policy language “property damage to which this insurance applies” in context of non-environmental claim),[12]
C. In sum, I am unable to follow the approach adopted by Patz and associated cases. With respect to the other cases cited above that have considered the owned property exclusion, their relevance is some *277 what limited. In contrast to many of these cases, the question here is not whether Royal is obligated to reimburse the Trustees for an amount it was mandated to pay for response and cleanup costs; the issue is instead whether Royal must reimburse for the amount the Trustees paid to settle a lawsuit raising a variety of claims against them, including some pertaining to response and cleanup costs.
Where an insurer breaches the duly to defend a claim against its insured, the insurer is not automatically required to pay the amount of a reasonable settlement of the claim undertaken by the insured, regardless of whether the claim was one for which coverage was provided. Polaroid Corp. v. The Travelers Indem. Co., 414 Mass. 747, 762-63 (1993). Rather, the insurer may seek to show that the claim was not within the coverage afforded by its policy, but the insurer will have the burden of proof on the issue. Id. at 764.
The Polaroid case does not discuss how these principles should be applied in a situation such as this case, where the insured (the Trustees) and the underlying claimant (SMALP) have reached a complete settlement of all claims raised in the claimant’s case, but have not allocated the settlement between or among those claims. Where, as here, an unallocated settlement is at issue, it would appear that the insurer should have the opportunity to prove that the settlement itself was not intended to cover claims covered by the policy, in whole or in part. See Servidone Constr. Corp. v. Security Ins. Co., 64 N.Y. 2d 419, 425 (1985).[13] See also Enserch Corp. v. Shand Moraban & Co, Inc., 952 F. 2d 1485, 1493-95 (5th Cir. 1992) (remanding case for factual determination of how insured’s settlement of bondholders’ suit should be apportioned among claims, for purposes of determining whether and how much of insurance coverage applied); American Home Assur. Co. v. Libbey-Owens-Ford Co., supra, 786 F.2d at 30-31 (same, but case involves liabilily insurance coverage provided by excess insurer to window manufacturer). Compare American Home Motorists Ins. Co. v. Trane Co., 544 F.Supp. 669, 689-91 (W.D. Wis. 1982) (remand for apportionment not necessary where, even though insurer was liable to cover only one of four claims settled by the insured, the insurer’s policy limits were low enough that they effected a practical and logical apportionment). Cf. Intel Corp. v. Hartford Acc. & Indem Co., 952 F.2d 1551, 1566 (9th Cir. 1991) (insured was not entitled to summary judgment against insurer on claim seeking full insurance coverage for mandated cleanup expenses; fact finder on remand would have to determine which expenses incurred by insured were intended to remedy or prevent damage to third-party property, and which were incurred only to remedy damage to property controlled by insured).
In this case, the jury were asked to determine how the settlement of the underlying SMALP case should be allocated between or among the various claims which SMALP had asserted in that case.[14] The jury concluded that the entire settlement should be allocated to costs of remediation — present and future — of contamination on the Property, and that none of it should be allocated to the variety of nonremediation claims the SMALP complaint had raised. The question is whether, in view of the jury’s answer, the owned property exclusion should be held not to apply.
I conclude that the owned property exclusion should not apply. As the discussion above indicates, it is generally agreed that where contamination of abutting property has been established, expenses associated with efforts to prevent further contamination of that property, even when the efforts take place on the insurer’s own property, in effect relate to the third-party property, and are not excluded by the owned property exclusion. See, e.g., State v. Signo Trading Intern., Inc., 130 N.J. 51, 612 A.2d 932, 939 (1992), and cases cited and discussed at 936-37. The juiy here specifically found that contaminants had migrated from the Property in or before June 1991 — the time when the SMALP case was settled — indicating that damage or destruction to third party property had indeed occurred. The evidence at trial, while hardly undisputed, certainly would permit findings that (1) an integral aim of those designing and implementing the remedial plan for SMALP was to take s teps that would prevent (further) migration of oil-contaminated materials to sites off the Properly; and (2) the persons most involved in negotiating the substantive details of the settlement of the SMALP action were aware of both the migration of oil-based contamination and the need for remediation of the Property to prevent further migration and associated damage.
Royal had the burden of proving that the settlement between SMALP and the Trustees was not within the policy’s coverage. Polaroid Corp. v. The Travelers Indem Co., supra, 414 Mass. at 764, citing Servidone Constr. Corp. v. Security Ins. Co., supra, 64 N.Y. 2d at 425. “If the insurer does not establish that this loss falls entirely within the policy exclusion as claimed, it will have failed to sustain its burden.” Servidone, 64 N.Y. 2d at 425. In this case, Royal did not sustain its burden of showing that the remediation costs which the jury found the settlement covered were intended solely for the purpose of remedying damage confined to the Property itself, rather than intended to prevent further damage to adjacent property, or to accomplish both such goals together.[15]
D. In reaching this conclusion, I acknowledge the jury’s answer to Question 6 presents some confusion. The jury were asked in that question to determine what portion of the $425,000 settlement between the Trustees and SMALP is properly allocated to SMALP’s claims for, inter alia:
a. asbestos removal from the Property?
b. “the costs of remediation of existing contamination on the Property other than asbestos?”
c. “the costs of remediation of existing contamination off the Property other than asbestos?”
*278 d. “the costs of future remediation of contamination on the Property (other than asbestos)?”
e. “the costs of future remediation of contamination off the Property (other than asbestos)?” . . .
The jury answered that $250,000 of the total was allocable to (b), remediation costs of existing contamination on the Property site; that $175,000 was allo-cable to (d), costs of future remediation on the Property; and none of the total was allocable to (c) or (e), both dealing with the costs of remediation of contamination off the Property.
Although Royal only makes brief reference to the point, the jury’s answer to Question 6 could be read as incorporating a determination that while the entire settlement is properly allocable solely to the costs of remedying the property, nevertheless, none of it was to go towards the prevention of off-site contamination. I do not believe this would be an accurate understanding of the jury’s answer.
The wording of Question 6(c) and (e) is unfortunate in its lack of clarity, but it may well have suggested to the jury, when read in conjunction with (b) and (d), that the costs referred to were for work actually done off the Property. Given the fact that there was no evidence of any intent by SMALP or its consultants to do remediation work off the Property itself, the jury’s answers may well reflect the jury’s reasonable conclusion that none of the settlement should be allocated to off-site remediation endeavors. The instructions to the jury did not describe individually the various SMALP claims separately listed in Question 6 (a) through (k), and thus contained no instruction that 6(b) and (d) referred only to costs associated with work intended only to clean up the Property itself, while 6(c) and (e) referred to costs for work done on the Property, but intended to prevent or remediate contamination on third-party Property. Nevertheless, as indicated above, there was a fair amount of evidence presented that an integral part of the remediation expenses for the Property itself which were discussed in the context of the settlement negotiations were intended to prevent further migration of contaminants off the Property.
Question 8 asked the jury whether, if the SMALP case had gone to trial, SMALP would have been able to prove that it reasonably expected to spend more than $425,000 “to remove oil-contaminated soil on the [Properly] for the purpose of preventing present and/or future groundwater contamination or of preventing present and/or future off-site migration of contaminants.” The jury responded yes. When that answer is considered in conjunction with the jury’s response to Question 6, it further supports the view that in Question 6, the jury were not determining that none of the remediation costs covered by the settlement was properly allocable to work done on the Properly for the purpose of preventing further contamination off the site.[16]
E. I return to Royal’s argument that the owned property exclusion applies in this case because there has been no third party property owner asserting a claim against the Trustees. A short answer to the argument is that a third party property owner has asserted a claim, namely SMALP; the settlement at issue is the settlement of SMALP’s suit. Royal contends, however, that SMALP does not qualify as a legitimate third parly owner, since it is the purchaser of the Property itself. Royal suggests any claim SMALP brought is barred by the alienated premises exclusion precluding coverage for damages resulting from properly damage to premises alienated by the insured.
I disagree. For the reasons outlined above, the alienated premises exclusion does not apply here, because the property damage at issue necessarily occurred during the policy period, which preceded the sale to SMALP. (See Section H.A., pp. 12-13.) In addition, and more fundamentally, even if the alienated premises exclusion were in issue, as the preceding discussion in Section II, C, and D indicates, Royal has failed to prove that all or even an identifiable portion of the settlement amount in this case was allocated to remediation costs intended solely to clean up the Property itself — a prerequisite to showing no coverage under the alienated premises as well as the owned property exclusion.[17]
In sum, since Royal did not satisfy its burden of showing that none of the settlement was covered by the insurance policy at issue, it is responsible for indemnifying the Trustees in connection with the full settlement amount.
III. Should the Monies the Trustees Received From the Settling Defendant Insurers be Offset against Royal’s Liability?
The Trustees have settled their claims against the four other insurers originally named as defendants in this action in the following manner:
Insurer Paid Amount Commercial Union $42,500 Liberty Mutual $65,000 Continental Casualty $85,000 Lumbermens Mut. Cas. $60.000 TOTAL $252,500 Date Paid Aug 8, 1991 Jan 12, 1994 Oct 24, 1994 Dec 19, 1994
The settling parties did not allocate any of these settlements between defense and indemnity claims or in any other manner. The Trustees argue that none of the $252,000 should be offset against Royal’s liability in this case. If offset is to occur, however, the Trustees contend that each of the other insurers’ settlements must be apportioned between the insurer’s potential defense and indemnity liabilities, and only that portion ascribed to indemnity should be offset.
Offset seems appropriate here. Contrary to the Trustees’ argument, it also seems appropriate to offset the total amount of each of the settlements against Royal’s liability. A party may not receive cumulative damages for the same wrong. See, e.g., McGrath v. Mishara, 386 Mass. 74, 83-85 (1982). See also Tritsch v. Boston Edison Co., 363 Mass. 179, 182 (1973) (“[a] plaintiff cannot properly receive remuneration in ex *279 cess of his actual damages”); Calimlim v. Foreign Car Center, Inc., 392 Mass. 228, 235-36 (1984) (discussion of cumulative damages in c. 93A). While it is true that the “damages” owed by Royal on account of its liability for indemnification of the Trustees will not duplicate any portions of the settlements that might properly be allocated to defense costs, the fact remains that the Trustees have already received reimbursement for almost all of their defense costs from Wausau.[18] Accordingly, any award of damages against Royal in this case which did not fully credit the settlements would appear to provide cumulative damages to the extent that credit was not given.[19] The Trustees are correct, however, that since full credit for the settlement amounts will be given to Royal in this “indemnity" case, the settlements should not be again offset against any award of damages the Trustees may recover in the separate action they have brought against Royal as assignee of Wausau’s right to claim contribution for defense costs.[20]
IV. Are the Trustees Entitled to Recover $17,886.70 in Defense Costs from Royal?
The Trustees seek to recover the attorneys’ fees and disbursements they expended in defending the SMALP action which were not covered by Wausau. There is no disagreement that Royal is liable in contract to the Trustees for defense costs in this case, given the determination that Royal wrongfully refused to defend. Polaroid Corp. v. The Travelers Indem. Co., supra, 414 Mass. at 762. What remains in dispute are the following issues: (1) whether the Trustees should be entitled to the fees as contract damages without any inquiry into their reasonableness; (2) if reasonableness is at issue, whether Royal must prove the urn-reasonableness of the defense costs sought, or the Trustees must prove their reasonableness; (3) how reasonableness, if an issue, should be judged: by considering the total defense costs together, or only the smaller portion the Trustees seek to recover here; and (4) the actual reasonableness of the fees.
A. The Trustees are entitled to recover reasonable defense costs, and therefore an inquiry into the reasonableness of the fees and disbursements is necessary. See Liberty Mut. Ins. Co. v. Continental Case. Co., 771 F.2d 579, 581-83 (1st Cir. 1985). Furthermore, since the fees are an element of the contract damages at issue here, the Trustees bear the burden of establishing what the appropriate level of damages should be.[21] Nonetheless, in the circumstances of a refusal on the part of Royal to fulfill its obligation to defend, I believe it appropriate simply to determine whether the Trustees have shown the fees they seek fit generally within a range of reasonableness; too nice a review of professional choices made by the attorneys who represented the Trustees in the face of Royal’s refusal to defend would not be fair. Cf. Fireman’s Fund Ins. Cos. v. Ex-Cell-O Corp., 790 F.Supp. 1339, 1345-46 (E.D. Mich. 1992) (requiring insurer which wrongfully refuses to defend “to demonstrate that the [legal] service provided was outside the parameters of [a] wide range of reasonable professional assistance”).
B. I have reviewed the evidence presented at the jury-waived trial on the contested $17,886.70 in defense costs, and I consider the issue of their reasonableness generally in light of the total spent on defense, namely, $279,789.54.[22] On the basis of that evidence, I am persuaded that it was within an acceptable range of reasonableness for the Trustees to retain separate counsel in view of the potentials for conflicts of interest between or among them, and in view of the different approaches the Trustees took to the litigation. Counsel were Mary Ryan, Esquire, of Nutter, McClennen & Fish, representing Bennett Rubenstein; John Houlihan, Esquire, of Edwards & Angelí, representing Adele Asher; and Alan Rubenstein, Esquire, of Rackemann, Sawyer & Brewster, representing Paul Rubenstein and John Rubenstein.[23]
Royal’s principal focus of attack seems to be on the claimed duplication of work among the three law firms representing the different Trustees. The testimony of Mary Ryan and John Houlihan established that the attorneys decided early on to conduct a joint defense against the SMALP suit, and met regularly to discuss joint strategy and joint preparation. Insofar as I accept the Trustees’ position that it was generally reasonable for three attorneys to be representing the different Trustees, I also accept the view that it was reasonable for the three to meet regularly, and, finally, that it was reasonable for each of the three to charge fees for the time that they met. Where additional attorneys from the respective law firms attended these meetings, however, I do not consider it reasonable to charge for their time as well.[24] Similarly, in the context of a joint defense, I do not consider it reasonable for more than one attorney from a firm to sit in on a deposition, and I have discounted the fees charged in these instances. I also have discounted for the appearance of more than one attorney to appear in court for the argument on a motion such as one seeking to change the track designation.
Wausau reimbursed the Trustees’ different attorneys at a maximum rate of $150 per hour. During the times in question, Ryan, Houlihan and Rubenstein all charged more than this figure as an hourly fee — in a range from approximately $ 185 per hour to $240 per hour — and the additional fees represented by the difference between the hourly maximum Wausau would cover and the amount charged are essentially what the Trustees seek to recover here. Royal does not appear seriously to contest the reasonableness of the hourly fees charged by the three attorneys, and I find them to be reasonable, taking into account the experience and skill of the respective attorneys and the area in which they practiced.
In sum, I find that $15,067.70 represents reasonable defense costs that the Trustees are entitled to recover from Royal in this case.[25]
*280 V. Plaintiffs’ Motion for Award of Attorneys’ Fees and Costs
Following the indemnity trial and further jury-waived trial on defense costs, the Trustees filed a motion to recover their attorneys fees associated with the current declaratory judgment case. They argue that recovery of such fees is appropriate as a form of consequential contract damages related to Royal’s wrongful decision not to defend the Trustees in the underlying SMALP action. They also argue that even the fees do not qualify as contract damages, they should be awarded either on public policy grounds— the Trustees emphasize the allegedly large discrepancy in resources available to an insurer like Royal as compared to insureds like the Trustees; or because Royal’s refusal to defend and insistence on a trial over the indemnify issue represents conduct that qualifies as unreasonable, in bad faith and vexatious.
The Trustees’ claim that attorneys’ fees incurred in prosecuting this action should be characterized as consequential damages has appeal as a matter of logic and also of fairness.
[I]t can be argued that the insurer should not be allowed lightly to force the insured to undergo substantial expense to prove that it had bought what it thought it had bought, i.e., the privilege of being defended by the insurer. Suits by the insurer challenging coverage are not to be encouraged. And the insurer, presumably being the expert in matters of coverage, should bear the risk of an unsuccessful challenge to coverage.
Liberty Mut. Ins. Co. v. Continental Cas. Co., supra, 771 F. 2d at 586.[26] Nevertheless, allowance of such fees goes against the generally applicable “American rule” requiring each party to pay its own fees and expenses. In the just-cited Liberty Mutual case, the United States Court of Appeals for the First Circuit concluded that the Supreme Judicial Court would not allow attorneys fees associated with declaratory judgment actions on coverage to be recovered as contract damages. Id. at 587. As previously discussed, in Polaroid Corp. v. The Travelers Indem. Co., supra, 414 Mass. at 762-65, decided after Liberty Mutual, the court ruled that an insured should be entitled to recover under general principles governing contract damages where its insurer breaches the duly to defend. However, there is no discussion in the Polaroid case suggesting that included among recoverable consequential damages are attorneys’ fees incurred in bringing an action directly against the insurer to establish the dufy to defend.[27] Nor does the New York Court of Appeals appear to allow recovery of such fees in the Servidone case cited and followed by the court in Polaroid.
I conclude that whatever logic and fairness supports an opposite rule, under current Massachusetts law, recovery of the fees the Trustees seek for prosecution of this action is not permitted as a form of consequential contract damages. Of course such attorneys fees would be allowed in connection with a successful claim against an insurer under G.L.c. 93A, §11, but there is no c. 93A claim in this case.
I also reject the Trustees’ arguments that an award of attorneys’ fees should be made as a matter of public policy or on account of Royal’s unreasonable and bad faith conduct in this case. The public policy argument with the most force is the one discussed above in connection with the Trustees’ contract damages theory, and it need not be further explored. On the issue of unreasonable conduct, the Trustees fail to sustain their burden of proof. Since a violation of G.L.c. 93A is not an issue in this case, in effect the Trustees assert they are entitled to recover the fees under G.L.c. 231, §6F. Royal was wrong in its decision not to defend the Trustees in the SMALP case, and ultimately wrong as well in denying responsibility to indemnify. But these decisions on Royal’s part have not been shown to have been frivolous or in bad faith. Cf. Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 15 (1989) (rejecting a claim of unfair or deceptive conduct under G.L.c. 93A on the part of the insurer for refusing to defend). The Trustees’ motion to recover its attorneys’ fees and expenses in this action should be denied.
VII. The Trustees’ Motion for Award of Expenses Under Rule 37(c).
After all trials had concluded in this case, the Trustees brought a motion to recover expenses under Mass.R.Civ.P. 37(c)[28] for Royal’s failure to admit the genuineness of certain documents and the truth of certain matters. The motion should be denied.
With respect to Royal’s failure to respond in a timely fashion to the Trustees’ original requests for admission concerning lost policy issues, I have accepted the explanation provided by Royal’s counsel which is reexplained in an affidavit of Molly Sherden, Esquire filed in connection with the Trustees’ motion for expenses. As for the responses which Royal did ultimately provide, I conclude that Royal had reasonable grounds to believe it might prevail. With respect to the requests on indemnify issues, I also conclude Royal had reasonable grounds to believe it might prevail.[29]
ORDER
For the foregoing reasons, it is ORDERED that judgment is to enter in this case declaring the rights of the parties in accordance with this memorandum of decision. Counsel are requested to confer and to submit a proposed form of judgment on or before September 7, 1995. It is further ORDERED that the Trustees’ motion for award of attorneys fees and costs, as well as the Trustees’ motion for award of expenses under Rule 37(c) be DENIED .

Consistent with their answers to Questions 2 and 3, the jury also answered that by June 10, 1991, there was an immediate or imminent threat that the release of No. 6 fuel oil on the property would migreate beyond the property’s boundaries, and would contaminate the groundwater. (Questions 4 and 5.)

A copy of policy no. 51668 has never been located. In the memorandum of decision after the lost policies trial, I determined, however, that the terms and conditions of the policy were those appearing in various policy specimen forms introduced in evidence at that trial.

In Tufts, the policy periods of the two defendant insurers’ policies extended from July 1, 1968 through July 1, 1975. Trustees of Tufts University v. Commercial Unionlns. Co., 415 Mass. 844, 845 (1993). A subsidiary of Tufts had owned the property in question for some period of time ending no later than the early 1960’s, and the contamination of the property was alleged to have occurred during that time. Id. at 846. The Jacksonville [Florida] Electric Authority (Jacksonville) acquired the property in 1977, and in 1989, Jacksonville filed suit against Tufts and others to recover environmental cleanup and response costs. Id. at 845-46. Although the argument of the insurers in Tufts as to why their policies did not cover Tufts’ defense of the underlying Jacksonville suit was different than Royal’s in this case — and therefore the court did not discuss an argument like Royal’s — it is significant that in Tufts, similar to the facts here, the release of contaminating materials had occurred before the insurance policy periods began. The court concluded, as the quotation from its opinion in the text above indicates, that there was property damage resulting from an “occurrence” within the policy periods.

This exclusion is referred to hereafter as the “owned property” exclusion.

This exclusion is referred to hereafter as the “alienated premises” exclusion.

There are cases suggesting that an alienated premises exclusion applies when the insured has sold the property at issue, even though the acts causing the damage occurred before the sale. See Borden v. Affiliated FM Ins. Co., 682 F.Supp. 927, 930-31 (S.D. Ohio 1987) (coverage for pollution cleanup; court ruled alienated premises exclusion applied; acts causing damage occurred before sale of property, but court did not discuss the timing of “damage” question). See also Reliance Ins. Co v. Povia-Ballantine Corp., 738 F.Supp. 523, 525-27 (S.D. Ga. 1990) (alienated premises exclusion barred coverage for suit brought by condominium purchasers against developer for negligent construction because “damage” suffered by purchasers occurred after sale). It bears noting that the position taken as to when “damage" occurred in the Reliance case is contrary to that adopted by the Supreme Judicial Court in Trustees of Titfts University v. Commercial Union Ins. Co., supra, 415 Mass. at 848-52. In any event, the reasons on which I rely in determining the owned property exclusion is inapplicable (discussed in Section IIB through D below) would apply equally to the alienated premises exclusion.

Where contamination has not migrated, the result is less clear. Some courts conclude that where the evidence shows the hazardous materials have so far contaminated only the insured’s property itself, and have not yet migrated to abutting property or, in some instances, groundwater, a claim for indemnification of response costs is barred by the owned property exclusion even though it might be shown that some or all of the costs were intended to prevent imminent migration to a third party property. See, e.g., State v. Signo Trading Internal’l, 130 N.J. 51, 612 A.2d 932, 938-39 (1992). See also Figgie Internat’l Inc. v. Bailey, 25 F.3d 1267, 1273-74 (5th Cir. 1994); Travelers Ins. Co. v. Waltham Ind. Laboratories Corp., 722 F.Supp. 814, 829 (D. Mass. 1988), aff'd in part and rev’d in part on other grounds, 883 F.2d 1092 (1st Cir. 1989); American States Ins. Co. v. Hanson Indus., 873 F. Supp. 17, 23-24 (S.D. Tex. 1995). Other cases conclude that where it is shown there is an imminent threat of damage to third-party property caused by the contamination of the insured’s property, coverage for response costs intended to eliminate the threat are covered, and allocation of response costs between those intended to deal with harm to other property and those intended to repair damage to the insured’s own property must take place. See, e.g., Intel Corp. v. Hartford Acc. & Index. Co., 952 F.2d 1551, 1565-66 (9th Cir. 1992); Savoy Medical Supply Co., Inc. v. F&H Mfg. Corp., 776 F.Supp. 703, 708 (E.D.N.Y. 1991). See also United Technologies Corp. v. Liberty Mut. Ins. Co., Suffolk Superior Court, C.A. No. 7172, Memorandum of Decision and Order on Defendants’ Motion for Summary Judgment dated August 3, 1993, slip op. at 24-26, 1 Mass. L. Rptr. 91 (appearing in Mealey’s Litigation Reports, Vol. 7, No. 37., August 10, 1993).

The court in Patz stated as follows:
St. Paul’s alternative ground is that the policy excludes coverage for property damage to property owned by the insured, and to date the only contamination ... is to soil and groundwater within the boundaries of the Patzes’ own land. But the Patzes are not attempting to obtain an insurance award for a reduction in the value of, or other damage to, their land. How could they? It is a policy of liability insurance, not casualty insurance, on which they have sued. They seek to recover the cost of complying with a government order to clean up a nuisance. The fact that the clean up occurred on their land is irrelevant. . .
Patz v. St. Paul Fire & Marine Ins. Co., 15 F. 3d 699, 705 (7th Cir. 1994).

 assume that Patz and the cases following it were construing comprehensive general liability policies with general insuring provisions and exclusion provisions that were essentially identical to those at issue here. The assumption is based on the fact that the general insuring clause, the owned property exclusion, and definitions of key terms such as “occurrence," and “property damage” are substantively the same in most comprehensive general liability policies. It is clear that the same language as in Royal’s policy was at issue in at least one case similar to Patz. See Unigard Mut. Ins. Co. v. McCarty’s, Inc., 756 F.Supp. 1366, 1369 and n. 3 (D. Idaho, 1988).

To the extent that Patz and its progeny are based on the simple fact that the costs for which the insured seeks coverage relate directly to a liability claim rather than a property damage claim, the analysis is also problematic. Obviously the insurance policy does not cover every liability claim raised against the insured. Rather, the liability claims to which it applies are those asserted “because of property damage to which this insurance applies.” Thus one cannot ignore the nexus between the type of property damage at issue and the “damages” claim.

In Servidone, a contractor sought insurance coverage for a settlement it had reached in a personal injury action brought by one of its employees; the contractor was defending against the employee’s claim pursuant to either a contractual or a common law indemnity obligation owed to a third party. The court reversed the grant of summary judgment on behalf of the insured and remanded the case for a determination by a fact finder as to whether the settlement fell within scope of the insurer’s policy, which excluded coverage for contractual indemnity claims but would cover common law indemnity claims. In so ruling, the court further stated that since the insurer had wrongfully failed to defend the insured in the underlying action, the insurer would carry the burden of proof *282 on remand to establish that the settlement did not fall within the policy’s coverage; unless the insurer established that the loss fell entirely within the policy exclusion for contractual claims, the insurer would have failed to sustain its burden. Servidone Constr. Corp. v. Security Ins. Co. of Hartford, 64 N.Y. 2d 419, 425 (1985).

AUocation was the subject matter of Question 6 of the special questions put to the jury.

I assume that a party in Royal’s position would be entitled to establish that a discrete and identifiable portion of a settlement was not within the policy coverage. As the text indicates, however, Royal did not, in my view, make such a proof.

 following the trial, Royal raised the argument that coverage is barred by the owned properly exclusion because the exclusion applies to property “used” by the insured, which in this case included the groundwater the Trustees had used in connection with the textile mill operations. Royal claims that the Trustees cannot “recover for any remediation costs expended for the purpose [of] mitigating damage to groundwater on the facts of this case.” (Memorandum of Royal Insurance Company of America on Legal Issues Regarding Interpretation of Insurance Policy Provisions at p. 11.) Even if one assumed the correctness of Royal’s premise of noncover-age for groundwater, again it was Royal’s burden to prove the SMALP settlement was allocable to costs associated with such a purpose. Royal did not sustain the burden.

This fact is a critical one distinguishing this case from Bausch & Lomb, 330 Md. 758, 625 A. 2d 1021 (1993), on which Royal relies. At issue in that case was insurance coverage for cleanup costs related to groundwater on the insured’s property. The court concluded that subsurface groundwater did not qualify as being owned by the state, and thus was not third-party property. In the absence of damage to third-party property, the court ruled that the exclusions in the policy pertaining to owned property or alienated premises barred coverage of the environmental response costs in contention. 625 A.2d. at 1033, 1036. In this case, of course, the jury found oil-based contamination had migrated to abutting property that was not owned by the Trustees or SMALP.

The Trustees were not reimbursed $17,886.70 in legal fees. The Trustees’ entitlement to reimbursement for this amount is an independent question, and is discussed below in Section IV.

The Trustees state that denying a credit for the settlements to Royal would not necessarily create a windfall for the Trustees because Royal may seek contribution from the settling insurers, and the Trustees have agreed to indemnify the insurers against any contribution ordered. The future rights and obligations of the settling insurers in relation to Royal are not issues that I should appropriately consider, particularly in a context where the insurers are not appearing as parties. Insofar as the terms of the Trustees’ settlements with those insurers are concerned, I do not take them into account because, among other reasons, the settlements are noi in evidence here. Accordingly, I do not give any weight to this argument of the Trustees.

While this is a declaratory judgment action, it is based on contractual obligations. It would appear, therefore, appropriate to award the Trustees interest on the amount of indemnification owed by Royal from the date the Trustees paid SMALP the $425,000 in settlement of the SMALP action, as representing the date of breach. See G.L.c. 231, §6C. The interest should be computed on the entire $425,000 with adjustments then made for the settlements received from the other insurers. See Boston Edison Co. v. Tritsch, 370 Mass. 260, 263-67 (1976).

I do not read Polaroid Corp. v. The Travelers Indem Co., 414 Mass. 747, 762-65 (1993), to the contrary. The shifting of burden to the insurer on the coverage question, see id. at 764-65, seems to be distinct from the question of defense costs.

Wausau spent $261,902.84 on the defense of the SMALP litigation. This amount added to the $17,886.70 spent by the Trustees comes to $279,789.54.

Royal’s expert, Stephen Anderson, Esquire, did not testify that the retention of more than one counsel was per se unreasonable; he did state that if multiple counsel were called for, two rather than three should have been sufficient. This seems to me to be a professional judgment call that I am reluctant to overturn. Mary Ryan, and John Houlihan, both gave opinion testimony that it was reasonable to retain three separate counsel for the different Trustees in this case.
Royal contends that the Trustees have not established the Trustees themselves are named insureds and entitled to representation, as opposed to the Trust. The Trust is represented by its trustees, however, and they would appear to be entitled to a defense in their representative capacities, whether or not named individually as named insureds.

The records indicate that Wausau itself paid for virtually all the time charged by attorneys working on the SMALP case other than Ryan, Houlihan and Alan Rubenstein. In view of the fact that the reasonableness of the fees paid by Wausau will be the subject of review in the Trustees’ separate action against Royal in their capacity as Wausau’s assignees, I have not subtracted any fees paid by Wausau from the total of $17,886.70 the Trustees seek here. Rather, when two attorneys from the same firm have attended a joint meeting or deposition, to the extent that one of them has charged the Trustees a fee over and above what Wausau reimbursed, I have discounted that excess.

As with the indemnity amount, it would seem that interest should be calculated from the date(s) of breach. See n.20 above.

As the Trustees point out in their motion, there is support m some treatises and in a number of other jurisdictions’ case law for a rule allowing an insured to recover attorneys fees incurred in successfully prosecuting or defending against a declaratory judgment action on the issue of the insurer’s duty to defend or indemnify. (See Plaintiffs’ Motion for Award of Attorneys Fees and Costs, pp. 17-21.)

Liberty argues that the Supreme Judicial Court’s silence has particular significance because at the trial level in the Polaroid case, a trial judge specifically ruled against the insured’s recovery of fees associated with the declaratory judgment action brought against the insurer. (See Royal’s Opposition to Plaintiffs’ Motion for Award of Attorneys Fees and Costs, p. 2.)

Rule 37(c) provides;
(c) Expenses on Failure to Admit. If a party fails to admit the genuineness of any documents of the truth of any matters as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making that proof, including reasonable attorneys fees. The court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 36(a), or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable grounds to believe that he might prevail on the matter, or (4) there was other good reason for the failure to admit.

The Trustees have litigated this case with commendable skill as well as noteworthy persistence for over five years. They have prevailed. They are entitled to a judgment in their favor. They do not need to extract a pound of flesh from Royal as well. It is time for this case to come to a close.